378 A.2d 288

**R. I. LAMPUS CO., a corporation, Appellant,**

**v.**

**NEVILLE CEMENT PRODUCTS CORPORATION, a corporation, Appellee.**

Supreme Court of Pennsylvania.

Argued March 8, 1976.

Decided Oct. 7, 1977.

William A. Johnson, Cooper, Schwartz, Diamond & Reich, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Jerome M. Libenson, Pittsburgh, for appellant.

Robert W. Doty, Peter C. Baggerman, Eckert, Seamans, Cherin & Mellott, Pittsburgh, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

MANDERINO, Justice.

The issue in this appeal concerns what damages for a breach of warranty are legally payable by the appellant, R. I. Lampus Co. (Lampus), to appellee, Neville Cement Products Corporation (Neville) under the Uniform Commercial Code, Act of April 6, 1953, P.L. 3, §§ 2–714 and 2–715, 12A P.S. § 2–714 and § 2–715(2).

Appellant Lampus is a concrete block manufacturer which supplied appellee Neville with certain kinds of cement block between 1963 and May of 1970. Neville used these blocks as components in the production of structural planks which were fitted together to form floor and ceiling systems in the construction of buildings. The blocks were delivered to Neville in bound "cubes" containing a number of blocks. These "cubes" were kept in Neville's inventory until needed on Neville's production line for the manufacture of the structural planks. The manufacturing of the planks involved (1) grinding the ends of the blocks to make them smooth; (2) assembling the blocks end to end to form a plank of the desired length; (3) placing reinforcing rods and a prestressing cable through the holes in the concrete block units and stressing the plank; (4) inserting grout around the reinforcing rods and cable and (5) curing the completed plank. The manufactured planks were fit together by tongue and groove to form the floor and ceiling systems in various types of buildings. After installation in a building, the grooves between the planks on the floor surfaces were filled in with grout to make a solid level floor. On the ceiling surface, the points formed by the abutting planks were filled with a cement caulking and any chips or defects were filled in and textured. The floor surface was then

ready to receive carpeting and the ceiling surface was ready for painting.

In 1963, when Neville began purchasing cement blocks from Lampus, Neville instructed Lampus as to its requirements for the block which it desired to use in the assembly of the floor and ceiling systems. These instructions included dimension, strength, and material requirements. From 1963 until 1967 Neville ordered block of a type known as "Dox" block. Beginning in 1967 Neville also began to order "Celdex" block, a block of a different size than "Dox" block. From August, 1968, until May, 1970, Neville purchased "Celdex" block exclusively.

During the 1967–1968 transition from the manufacture of "Dox" block to "Celdex" block, Lampus experienced certain manufacturing problems resulting in the delivery of some defective blocks to Neville. By letter dated July 21, 1968, Neville made claims against Lampus in the amount of $51,990.24 for damages suffered as the result of defective blocks received. On August 15, 1968, Lampus settled the claim by crediting Neville's account for $25,000.00. Lampus, however, did not solve its manufacturing problems and some of the blocks it delivered afterwards were also defective, either in structural soundness or aesthetic appearance. Complaints by Neville resulted in repeated meetings between the parties. At these meetings Lampus representatives were shown samples of the defective blocks. Lampus representatives were also shown finished ceilings which did not have the required appearance because of defects in the blocks. Lampus acknowledged it was having manufacturing problems and indicated that they could be solved.

During the time of these meetings, Neville continued to order the Celdex blocks as needed and received deliveries until May, 1970. Subsequently, by letter dated July 15, 1970, Neville submitted a claim for damages allegedly sustained after July 31, 1968, as a result of the defective blocks. Shortly thereafter, Lampus brought an action in assumpsit to recover over $97,000 allegedly due for the concrete block units and related equipment and supplies. Neville filed a

counterclaim for damages totalling approximately $178,000 claiming breach of express and implied warranties. The damages were alleged to be both the direct and consequential result of Lampus' failure to supply blocks in conformity with these warranties.

In a nonjury trial, Lampus was awarded $80,464.36 on its claim. Neville was awarded $39,994.44 on its counterclaim resulting in a net verdict in favor of Lampus for $40,469.92 with appropriate interest. Exceptions were filed by both parties, and the court *en banc* allowed Neville an additional $2,051.61, and entered a net verdict for Lampus in the amount of $38,418.31 with interest.

The trial court *awarded damages* for the following items claimed by Neville: (1) concrete block rejected on Neville's production line; (2) defective concrete block units in Neville's inventory; (3) floor systems which failed during production; (4) loss of plant time due to structural floor systems blown up during production.

The trial court *denied damages* for the following items claimed by Neville: (5) floor systems which failed after assembly and were rejected at the plant; (6) hauling costs for disposal of defective concrete block and floor systems; (7) the labor cost of an extra employee to handle broken and rejected concrete block units; (8) the cost of the floor systems rejected at the construction site by Neville's customers; (9) costs incurred due to ceiling which required special covering materials; (10) excess costs incurred in pointing and caulking ceiling surfaces.

In denying these last six items claimed by Neville, the trial court, relying on *Keystone Diesel Engine Co. v. Irwin*, 411 Pa. 222, 191 A.2d 376 (1963) found there were no "special circumstances" warranting recovery of consequential damages because there was "insufficient evidence to indicate Neville communicated to Lampus at the time of entering into the contract sufficient facts to make it apparent that the damages subsequently claimed were within the reasonable contemplation of the parties."

Neville then appealed to the Superior Court which unanimously reversed as to four of these items (Nos. 5, 6, 7, and 8) and affirmed as to two (Nos. 9 and 10). *R. I. Lampus Co. v. Neville Cement Products Corp.*, 232 Pa.Super. 242, 336 A.2d 397 (1975). The Superior Court discussed *Keystone Diesel, supra*, and commented on "certain difficulties faced by courts and commentators in interpreting *Keystone Diesel* in light of the Code provisions . . . ." The Court also noted that the "tacit agreement" test seemingly used in *Keystone Diesel* to determine the existence of "special circumstances" under section 2–714(2) appears inconsistent with Uniform Commercial Code section 2–715(2)(a). Section 2–715(2)(a) states that consequential damages include any loss resulting from the buyer's needs or requirements "of which the seller at the time of contracting *had reason to know*," (emphasis added), thus indicating a "reasonable foreseeability" approach. The Superior Court opinion also refers to Comment 2 of section 2–715, which states that "[t]he 'tacit agreement' test for the recovery of consequential damages is rejected," and Comment 3 which states that "[i]t is not necessary that there be a conscious acceptance of an insurer's liability on the seller's part."

After expressing its hope that this consequential damages issue would be clarified by us, the Superior Court decided the case under *Keystone Diesel's* "special circumstances" test. It found, contrary to the trial court, that items 5 through 8 were within the contemplation of the parties at the time they entered into the contracts at issue "because the record reveals that sufficient facts were communicated to Lampus to put it on notice that Neville intended to hold it responsible for the damages it seeks to recover." It affirmed the trial court's disallowance of the last two items, Nos. 9 and 10, because they were losses which reasonably could have been prevented, and because 2–715(2)(a) limits recovery to those consequential damages "which could not reasonably be prevented by cover or otherwise." Finally, the Superior Court concluded that Neville was not barred, under Uniform Commercial Code Section 2–607(3)(a), relat-

ing to notice to the seller of breach, because "many meetings between the parties took place during the years in question, and . . . Neville's dissatisfaction with the concrete blocks were expressed to Lampus and acknowledged."

We granted Lampus's petition for allowance of appeal to review the decision of the Superior Court and this appeal followed.

Lampus contends (1) that under *Keystone Diesel,* the four items of damages allowed by the Superior Court were not within the contemplation of the parties; and that (2) Neville "waived" its claim for damages by its course of conduct throughout an extensive period of dealing.

The relevant provisions of the Uniform Commercial Code read as follows:

> "*Section 2–714. Buyer's Damages for Breach in Regard to Accepted Goods*
>
> (1) . . .
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless *special circumstances* show proximate damages of a different amount.
>
> (3) *In a proper case* any incidental and consequential damages under the next section may also be recovered.
>
> *Section 2–715. Buyer's Incidental and Consequential Damages*
>
> (1) . . .
>
> (2) Consequential damages resulting from the seller's breach include
>
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting *had reason to know* and which could not reasonably be prevented by cover or otherwise; and
>
> (b) injury to person or property proximately resulting from any breach of warranty." (Emphasis added.)

*Keystone Diesel Engine Co. v. Irwin,* 411 Pa. 222, 191 A.2d 376 (1963), was one of the first cases to deal with consequential damages under these sections of the Uniform Commercial Code. In *Keystone Diesel,* a dealer in diesel engines sold a diesel engine to one Irwin. This engine was subsequently installed in a tractor, but did not function properly. Repairs were then made for which Irwin refused to pay. Keystone sued in assumpsit and Irwin filed a counterclaim for loss of profits. The basis of the counterclaim was Irwin's inability to use the tractor for 27 days because of various breakdowns of the engine, in breach of an implied warranty of merchantability. The trial court struck off the counterclaim because the claim for loss of profits was too speculative. We affirmed, holding that "special circumstances," mentioned in Section 2–714(2), must be communicated to the seller to make it apparent that the consequential damages, mentioned in Section 2–715, were within the reasonable contemplation of the parties.

■ Lampus now asks us to apply the law of *Keystone Diesel* to this case. It argues that "special circumstances" (Section 2–714(2)) were not established by Neville and thus Neville is not entitled to the consequential damages (Section 2–715) claimed because the parties did not contemplate such damages. Upon further reflection, however, we conclude that *Keystone Diesel* incorrectly held that the "special circumstances" mentioned in Section 2–714 must be established before consequential damages under Section 2–715 can be recovered. Section 2–714(2) is concerned with *value of the goods* damages and not with incidental (Section 2–715(1)) or consequential damages (Section 2–715(2)). *See* J. White & R. Summers, *Uniform Commercial Code* 311 (1972) [hereinafter White & Summers]; Peters, *Remedies for Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Road Map for Article Two,* 73 Yale L.J. 199, 271–72 (1963). Under Section 2–715(2), consequential damages are proper for any loss resulting from general or particular requirements and needs of which the seller at the time of contracting *had reason to know* and which could

not reasonably be prevented by cover or otherwise. Section 2–715(2) in effect rejects what is called the "tacit agreement" test in favor of the "reasonably foreseeable" test.

Professors White and Summers described the two tests as follows:

"The more restrictive or 'tacit-agreement' test permits the plaintiff to recover damages arising from special circumstances only if 'the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, [such liability] when the contract was made.' [*Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S.Ct. 754, 47 L.Ed. 1171 (1903).] In effect, this test requires the plaintiff to prove that the parties had specifically contemplated that consequential damages might result and that the defendant actually assumed the risk of such damages. The other group of cases, and certainly the recent trend of authority, has rejected this test. As Professor Corbin said:

All that is necessary, in order to charge the defendant with the particular loss, is that it is one that ordinarily follows the breach of such a contract in the usual course of events, or that reasonable men in the position of the parties would have foreseen as a probable result of breach." [5 A. Corbin, Corbin on Contracts § 1010 at 79 (1964).]"

*White & Summers, supra,* at 316 (footnotes omitted.)

These commentators conclude that the drafters of the Code agreed with the latter view:

"[The result in *Keystone Diesel*] is out of harmony with the language of section 2–715(2) and of Comments 2 and 3. . . .

\* \* \* \* \* \*

"Most other courts that have considered the questions of consequential damages have followed the objective [foreseeable] approach . . . rather than the tacit agreement [foreseen] approach of Keystone."

*Id.* at 318.

That section 2–715(2) does not condition recovery of consequential damages upon a "tacit agreement" of the parties now appears correct to us. All that is required is that the seller *have reason to know* the buyer's needs and requirements. This is made clear by Comments 2 and 3 to 2–715:

"2. Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach. *The 'tacit agreement' test for the recovery of consequential damages is rejected.* Although the older rule at common law which made the seller liable for all consequential damages of which he had 'reason to know' in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise."

\* \* \* \* \* \*

"3. In the absence of excuse under the section on merchant's excuse by failure or presupposed conditions, *the seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or particular requirements at the time of contracting. It is not necessary that there be a conscious acceptance of an insurer's liability on the seller's part,* nor is his obligation for consequential damages limited to cases in which he fails to use due effort in good faith.

Particular needs of the buyer must generally be made known to the seller while general needs must rarely be made known to charge the seller with knowledge." (Emphasis added.)

We now conclude that the "special circumstances" requirement of Section 2–714(2) is unrelated to the recovery of consequential damages provided for by Section 2–715(2). This interpretation is consistent with the liberal intent of the drafters of the Code as that intent is reflected in Comments 2 and 3 to section 2–715. It is also consistent with the interpretation given to Sections 2–714 and 2–715 in other jurisdictions which have rejected the *Keystone Diesel*

approach. See *Lewis v. Mobil Oil Corp.*, 438 F.2d 500 (8th Cir. 1971) (Arkansas law); *Beal v. General Motors Corp.*, 354 F.Supp. 423 (D.Del.) (1973); *Adams v. J. I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1 (1970); *Jerry Alderman Ford Sales, Inc. v. Bailey*, Ind.App., 291 N.E.2d 92 (1972); *Valley Die Cast Corp. v. A. C. W. Inc.*, 25 Mich.App. 321, 181 N.W.2d 303 (1970). *Cf. Gulf Chemical & Metalurgical Corp. v. Sylvan Chemical Corp.*, 122 N.J.Super. 499, 300 A.2d 878 (Law Div.), aff'd, 126 N.J.Super. 261, 314 A.2d 73, App.Div. (1973).

Under Section 2–715(2), Neville was entitled to any consequential damages resulting from its general or particular requirements and needs which Lampus *had reason to know* and which could not reasonably be prevented by cover or otherwise. The "had reason to know" test does not require that it be shown that the seller contemplated or tacitly agreed to certain consequential damages. A seller "had reason to know" that which a reasonable person would have known. Of necessity, the test also covers that which a seller knows. If a seller knows of a buyer's general or particular requirements and needs, that seller is liable for the resulting consequential damages whether or not that seller contemplated or agreed to such damages. Applying this test rather than the *Keystone* test followed by the Superior Court, we reach the same conclusion. Lampus not only had reason to know, it actually knew, *all* of Neville's requirements and needs. Lampus knew that the cement blocks had to meet certain structural and aesthetic standards to be of full value to Neville. It knew exactly what use Neville was making of the blocks. It knew that the blocks were to be formed into planks for use in structural floor and ceiling systems. In short, there was absolutely nothing that Lampus, the seller, did not know about the general or particular requirements and needs of Neville, the buyer. Moreover, there is no doubt that Neville's losses resulted from its requirements and needs as known by Lampus. Under these circumstances, Neville was entitled to the consequential damages awarded by the trial court and the Superior Court.

210

Lampus also renews before us the waiver argument raised in the Superior Court. We have examined this issue and find Lampus's position to be without merit.

 Neville also questions the correctness of the Superior Court's order disallowing Neville's claim for damages under category No. 9 and No. 10. Lampus has moved to strike that portion of Neville's brief because Neville did not file a petition for allowance of appeal from the order of the Superior Court. We agree with Lampus and grant the motion to strike. We thus express no opinion as to those two items of damages.

The order of the Superior Court is affirmed.

JONES, former C. J., did not participate in the decision of this case.