787 A.2d 376

The BIRTH CENTER

v.

The ST. PAUL COMPANIES, INC., Sharon
Dawson–Coates and Al Afonso,

**Appeal of The St. Paul Companies, Inc.**

Supreme Court of Pennsylvania.

Argued Oct. 17, 2000.

Decided Dec. 31, 2001.

388

Thomas P. Wagner, Carl D. Buchholz, Joshua Bachrach, Philadelphia, for The St. Paul Companies, Inc., Nos. 25–26 M.D. Appeal Docket 2000.

John S.J. Brooks, Michael Bradley, Media, for The Birth Center, Nos. 25–26 M.D. Appeal Docket 2000.

Carl D. Buchholz, Philadelphia, for St. Paul Companies, Inc., No. 27 M.D. Appeal Docket 2000.

Thomas P. Wagner, Joshua Bachrach, Philadelphia, for The St. Paul Companies, Inc., No. 27 M.D. Appeal Docket 2000.

John S.J. Brooks, Michael Bradley, Media, for The Birth Center, No. 27 M.D. Appeal Docket 2000.

Thomas P. Wagner, Joshua Bachrach, Philadelphia, for The St. Paul Companies, Inc., No. 28 M.D. Appeal Docket 2000.

Carl D. Buchholz, Philadelphia, for St. Paul Companies, Inc., No. 28 M.D. Appeal Docket 2000.

John S.J. Brooks, Michael Bradley, Media, for The Birth Center, No. 28 M.D. Appeal Docket 2000.

## *OPINION*

NEWMAN, Justice.

The St. Paul Companies, Inc. ("St.Paul") appeals from an Order of the Superior Court that reversed the Order of the Court of Common Pleas of Delaware County ("trial court"), which granted St. Paul's motion for judgment notwithstanding the verdict. The jury found, by clear and convincing evidence, that St. Paul acted in bad faith when it refused to settle a civil action [1] against The Birth Center ("Birth Center"), and that St. Paul's bad faith conduct was a substantial factor in causing The Birth Center to incur compensatory damages in the amount of $700,000.00.

We affirm the decision of the Superior Court. Where an insurer refuses to settle a claim that could have been resolved within policy limits without "a bona fide belief ... that it has a good possibility of winning," it breaches its contractual duty to act in good faith and its fiduciary duty to its insured. *Cowden v. Aetna Casualty and Surety Company,* 389 Pa. 459, 134 A.2d 223, 229 (1957). Therefore, the insurer is liable for the known and/or foreseeable compensatory damages of its insured that reasonably flow from the bad faith conduct of the insurer. The fact that the insurer's intransigent failure to engage in settlement negotiations forced it to pay damages far in excess of the policy limits so as to avoid a punitive damages award, does not insulate the insurer from liability for its insured's compensatory damages where the insured can prove that the insurer's bad faith conduct caused the damages.[2]

1. *Norris v. Birth Center,* (Del. Co. Ct of Common Pleas Docket No. 86–16841) *("Norris ")*.

2. St. Paul could have easily avoided liability by engaging in good faith settlement negotiations. Instead, St. Paul patently disregarded the

## FACTUAL AND PROCEDURAL HISTORY
### The Underlying Action—Norris v. The Birth Center

This claim arose out of St. Paul's bad faith refusal to engage in settlement negotiations in the underlying action, *Norris*. In that case, Gerald and Denise Norris ("Parents") filed suit on November 16, 1986 against Birth Center [3] alleging that its negligence during the birth of their daughter Lindsey, caused her to suffer severe physical injury and permanent brain damage. After service of the complaint, The Birth Center turned to St. Paul, its professional liability insurance carrier, for its legal defense.[4] St. Paul hired counsel to defend The Birth Center and undertook an investigation of the Parents' claim.

On August 2, 1991, the Parents proposed, on behalf of Lindsey, to settle the case within the limits of The Birth Center's professional liability insurance policy with St. Paul. The Birth Center notified St. Paul that it was making a firm demand to settle the case within its policy limits. On August 7, 1991, St. Paul refused to settle or to even make an offer of settlement.

During the course of an August 8, 1991 pre-trial conference, the presiding judge recommended settlement of *Norris* within the limits of The Birth Center's insurance policy. Again, St. Paul refused. At a second pre-trial conference, a second judge assigned to the case also recommended settlement within Birth Center's policy limits. The Birth Center demanded settlement in accordance with the judge's recommendation; but St. Paul refused to negotiate or offer any money.

interests of its insured by refusing to negotiate. For example, after the trial began but before the jury announced its $4,500,000.00 verdict, St. Paul refused to offer any money.

For an insurer to refuse to offer any money and to state that it tries "all of these bad baby cases" (N.T. 5/6/96 at 16) regardless of the impact that decision might have on its insured invites a bad faith case.

3. The Parents also sued two doctors (who Birth Center employed) and the attending midwife.

4. St. Paul insured Birth Center under a professional liability policy with a $1,000,000.00 policy limit.

In January of 1992, St. Paul requested the defense attorneys for The Birth Center and one of the doctors involved in Lindsey's delivery to prepare pre-trial reports for St. Paul's consideration. In her report to St. Paul, defense counsel for The Birth Center stated that The Birth Center had, at best, a fifty-percent chance of successfully defending the lawsuit at trial. Furthermore, she advised that the jury verdict could range from $1,250,000.00 to $1,500,000.00. The doctor's defense counsel advised St. Paul that he believed that The Birth Center had a thirty-five percent chance of winning at trial and predicted a jury verdict of $5,000,000.00 to $6,000,000.00.

On January 27, 1992, the executive director of The Birth Center put St. Paul on written notice of the potential for compensatory damages and expressed her deep concerns regarding the possibility of a verdict in excess of Birth Center's policy limits. She explained that such a verdict would have devastating effects upon The Birth Center and could risk its continued existence. When expressing the same concerns to the St. Paul claims representative assigned to the case, the claims representative informed her that St. Paul tries *all of these bad baby cases, and we're going to trial.*" (N.T. 5/6/96 at 16) (emphasis added).

Before the commencement of the *Norris* trial, a third judge, who ultimately presided over that trial, held another conference and recommended settlement within The Birth Center's policy limits.[5] St. Paul refused to make any offer whatsoever. Then, on February 12, 1993, the Parents made a high/low offer of settlement, in which St. Paul would pay a non-refundable $300,000.00 amount regardless of the verdict. If, however, the jury returned a verdict in excess of Birth Center's policy limits, the Parents agreed to accept the policy limits as total satisfaction of the verdict. Finally, the settlement offer provided that if the jury returned a verdict lower than The Birth Center's maximum coverage, but higher than the low figure of $300,000.00, then the Parents would accept such verdict as full

5. Kenneth A. Clouse, Judge of the Court of Common Pleas Delaware Co., presided over the trial of the underlying action, *Norris v. The Birth Center.*

satisfaction of The Birth Center's liability. St. Paul refused this offer of settlement and made no counter-offer.

On February 16, 1993, the day of trial, a final pre-trial conference took place in the robing room of the trial judge. At this time, the Parents reasserted their high/low offer of settlement. The Birth Center expressed its desire that St. Paul agree to the Parents' proposal; but, a representative of St. Paul, present during the discussion in the robing room, rejected the high/low offer of settlement on the record. Following St. Paul's rejection, the judge stated that he believed that St. Paul's actions were in bad faith and that it was putting its interests ahead of those of its insured. (N.T., 2/16/93, at 15–19).

The *Norris* trial ensued. After the start of the trial, but before the jury returned a verdict, the trial judge instructed defense counsel for The Birth Center to contact St. Paul to see if it intended to make any offer of settlement. When counsel returned from her telephone conversation with St. Paul, she stated to those present in the robing room: "They must be crazy. They're not offering a dime. They won't give me authority to offer any money in this case, you know I can't believe it." (N.T., 5/3/96, at 69).

On March 4, 1993, the jury returned a verdict in favor of the Parents for $4,500,000.00, with The Birth Center liable for sixty percent of that amount. The final verdict was molded to include delay damages and interest and totaled $7,196,238. The Birth Center's ultimate liability amounted to $4,317,743.00. St. Paul agreed to indemnify The Birth Center for the entire verdict and the parties settled the case for $5,000,000. Before St. Paul paid the excess verdict, it requested that The Birth Center sign a release in exchange for the payment, but The Birth Center refused to sign the release. St. Paul paid on September 20, 1993.

### The Birth Center v. St. Paul—The Bad Faith Action

On June 3, 1994, The Birth Center sued St. Paul, alleging that St. Paul breached its fiduciary duty to The Birth Center, its implied covenant of good faith, and its contract. The Birth

Center also claimed that St. Paul's failure to settle *Norris* within its policy limits constituted negligence, reckless disregard for the rights of Birth Center, willful and wanton behavior and bad faith pursuant to the Bad Faith Statute, 42 Pa.C.S.A. § 8371.

On May 3, 1996, the trial began. The Birth Center claimed that St. Paul's refusal to engage in reasonable settlement negotiations damaged "its business, reputation and credit." Appellee's Br. at. 11. After the trial, the jury found, by clear and convincing evidence, that St. Paul acted in bad faith and that its actions were a substantial factor in bringing about harm to The Birth Center totaling, $700,000.00 in compensatory damages. The jury did not award punitive damages.

St. Paul moved for judgment notwithstanding the verdict. On February 7, 1997, the trial court[6] granted St. Paul's motion. The trial court concluded that St. Paul's payment of the excess verdict nullified Birth Center's bad faith claim, that compensatory damages are not available pursuant to 42 Pa. C.S.A. § 8371, and that, because it believed that it had not charged the jury on the breach of contract claim, that The Birth Center could not recover compensatory damages based on that theory. *See The Birth Center v. St. Paul Companies, Inc.,* No. 94–6492, slip op. at 9 (C.P. Delaware County Aug 11, 1997). The trial court denied The Birth Center's motion for reconsideration. On June 10, 1997, the trial court entered judgment in favor of St. Paul.

On appeal, the Superior Court determined that the payment of the excess verdict did not preclude the award of compensatory damages and that the trial court had charged the jury on breach of contract. Therefore, it reversed the decision of the trial court, reinstated the jury award, and remanded the case for a determination of The Birth Center's entitlement to interest, attorney's fees and costs pursuant to 42 Pa.C.S.A. § 8371.[7]

---

6. Judge George Koudelis, Judge of the Court of Common Pleas Delaware Co., presided over the trial of the Birth Center's bad faith action against St. Paul.

7. *The Birth Center v. St. Paul Companies Inc.,* 727 A.2d 1144 (1999).

St. Paul appealed the Superior Court's decision to this Court.

## DISCUSSION

### St. Paul's Arguments in Opposition to the Award of Compensatory Damages

St. Paul sets forth four reasons why it is not liable for Birth Center's compensatory damages. First, it asserts that its payment of the excess verdict barred Birth Center's bad faith claim. St. Paul argues that allowing bad faith claims despite an insurer's "voluntary" excess payment would discourage insurance companies from satisfying future excess verdicts. Second, St. Paul contends that *D'Ambrosio v. Pennsylvania National Mut. Ins.*, 494 Pa. 501, 431 A.2d 966 (1981) bars The Birth Center's claim. Third, St. Paul points to 42 Pa.C.S.A. § 8371, which authorizes the award of punitive damages, attorneys fees and costs when an insurer is found to have acted in bad faith, and asserts that because the statute does not mention compensatory damages, none are available. Fourth, St. Paul argues that the trial court did not charge the jury on The Birth Center's breach of contract claim and that, as a result, The Birth Center may not recover compensatory damages based on that claim. In turn, we address and reject St. Paul's arguments.

### The Trial Court Charged the Jury on Breach of Contract

Although this is St. Paul's final argument, we address it first because if the trial court did not charge the jury on breach of contract, The Birth Center could only recover compensatory damages from St. Paul if some other theory provided a basis for recovery. As we discuss in this opinion, neither 42 Pa.C.S.A. § 8371 nor any other relevant cause of action provide a basis for recovery. Thus, Birth Center's compensatory damage award depends on whether The Birth Center asserted a contract cause of action and whether the trial court charged the jury regarding that claim.

The Superior Court properly determined that The Birth Center asserted a breach of contract claim. Birth Center's

Complaint requests compensatory damages based upon its insurance contract with St. Paul. Complaint ¶¶ 76–77. The Complaint provides:

76. By failing to settle the Norris claim within the limits of the insurance policy of The Birth Center, the Defendants herein breached their contractual obligations to The Birth Center under said policy of insurance, by failing to protect The Birth Center and their [sic] assets.

77. The Defendants herein, in the performance of the said contract, owed to The Birth Center, a fiduciary duty to act in good faith, and to use due care in representing The Birth Center's interests.

\* \* \*

**WHEREFORE,** Plaintiff The Birth Center demands judgment against Defendants in an amount in excess of ... $50,000, plus additional compensatory and/or consequential damages allowed by law, together with interest thereon, Court costs, attorney's fees and such other relief as the Court deems just and proper.

*Id.* Therefore, it is clear that The Birth Center alleged a claim sounding in contract.

Additionally, the trial court charged the jury with regard to The Birth Center's contract cause of action. The court charged the jurors, *inter alia,* that if they found that St. Paul breached its contract with The Birth Center, that they were to award compensatory damages if the breach caused the damages, and the damages were reasonably foreseeable at the time the parties entered into the contract and at the time of the breach. Specifically, the trial judge charged, among other things, that:

where one party to a *contract breaches that contract,* the other party may recover for those injuries which have been proved to you with reasonable certainty.

\* \* \*

If you find that defendant St. Paul *breached its contract* with the Birth Center, you must then decide based on all of the evidence presented what amount of money will compen-

sate the Plaintiff for those injuries, which were a direct and foreseeable result of the *breach* by St. Paul which the parties could reasonably foresee at the time they made that *contract* and at the time of the Defendant's *breach of the contract.*

(N.T., 5/10/96, at 246–247 emphasis added).[8] The jury returned a verdict finding that St. Paul acted in bad faith in its handling of the underlying *Norris* case, and that the bad faith conduct was a substantial factor in bringing about harm to The Birth Center in the amount of $700,000. The jury verdict sufficiently established that the jury considered the breach of contract claim. The jury found that St. Paul acted in bad faith; St. Paul had a contractual duty to act in good faith; therefore, St. Paul breached its contract.

In reviewing the propriety of an order granting or denying judgment notwithstanding the verdict, we must determine whether there was sufficient competent evidence to sustain the verdict. *Wenrick v. Schloemann–Siemag Aktiengesellschaft,* 523 Pa. 1, 564 A.2d 1244, 1246 (1989). We view the evidence in the light most favorable to the verdict winner and give him or her the benefit of every reasonable inference arising there from while rejecting all unfavorable testimony and inferences. *Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003, 1007 (1992). Moreover, "[a] judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner." *Id.; see, Atkins v. Urban Redevelopment Authority of Pittsburgh,* 489 Pa. 344, 414 A.2d 100 (1980). Finally, "a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury ..." *Moure,* 604 A.2d at 1007 quoting *Brown v. Shirks Motor Express,* 393 Pa. 367, 143 A.2d 374 (1958).

**8.** Accordingly, the charge, in Birth Center's bad faith action against St. Paul, specifically authorized the jury to award compensatory damages based upon the breach of contract claim. If the judge did not want to charge the jury with regard to the possibility for a breach of contract recovery, he should have limited his charge to 42 Pa.C.S.A. § 8371. See p. 16 infra.

A court may not vacate a jury's finding unless "the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Moure,* 604 A.2d at 1007 quoting *Cummings v. Nazareth Borough,* 427 Pa. 14, 233 A.2d 874 (1967). While we respect Judge Koudelis' opinion that St. Paul's refusal to engage in settlement negotiations was not in bad faith, the jury was the finder of fact. It found that based upon all of the evidence that The Birth Center proved "by clear and convincing evidence that [St. Paul] acted in bad faith in handling the underlying case of *Norris v. The Birth Center.*" We also note that Judge Clouse, who tried the underlying case, stated, the day of trial, that he believed that St. Paul's settlement posture was in bad faith and inconsistent with its fiduciary duty to the Birth Center. Specifically, Judge Clouse expressed his opinion that:

> [t]here is a clear indication of *bad faith* here. I think the insurance company is not proceeding in a responsible manner and is *not discharging its fiduciary obligation to its insureds* in this case ... I think this insurance company has operated in a highly irresponsible manner. I want it clear that they have turned this high/low offer of $300,000.00 down in which [sic] I think is a *breach of their fiduciary responsibility* to their insureds. And I want that clear on this record.

(N.T., 2/16/93, at 15–19, emphasis added). While Judge Clouse's opinion is arguably irrelevant to the jury's determination that St. Paul acted in bad faith, it is a compelling indication of how a reasonable jury could have come to a similar conclusion that St. Paul acted in bad faith.

■ While a judge may disagree with a verdict, he or she may not grant a motion for J.N.O.V. simply because he or she would have come to a different conclusion. Indeed, the verdict must stand unless there is no legal basis for it. Without agreeing or disagreeing with Judge Koudelis or Judge Clouse, we view the evidence in the light most favorable to Birth Center, the verdict winner, and give it the benefit of every reasonable inference arising therefrom while rejecting all un-

favorable testimony and inferences. From that perspective, we are unable to conclude that no reasonable jury could have found that St. Paul acted in bad faith. Therefore, although, like Judge Koudelis, we may not have reached the same verdict as the jury, there was sufficient evidence to sustain the verdict and a reasonable basis for the jurors to have found, from the evidence—that St. Paul acted in bad faith. Consequently, the trial court should not have granted the motion for a directed verdict based on St. Paul's argument that it did not act in bad faith.

### *Payment of the Excess Verdict*

■ Next, we address St. Paul's arguments that the trial court properly granted its motion for a judgment notwithstanding the verdict because of its contentions that: (1) an insurer's payment of an excess verdict precludes all bad faith claims, and (2) allowing The Birth Center to recover additional compensatory damages would discourage insurance companies from satisfying excess verdicts. St. Paul states:

> The effect of the Superior Court's holding is to discourage insurance companies from satisfying excess verdicts unless they are required to do so. If an insurance company can still be exposed to a bad faith suit even *after* voluntarily satisfying an excess verdict, the company has no incentive to pay the excess.
>
> \* \* \*
>
> If it remains exposed to the bad faith claim and punitive damages anyway, the obvious course for the insurance company is to stand its ground, defend the bad faith claim, and leave its insured to its own devices.

Appellant's Br. at 15.

While St. Paul's argument has facial appeal, it does not stand up to closer examination. St. Paul did not pay the excess verdict out of the goodness of its heart. It had reason to believe that The Birth Center was going to sue for bad faith [9] and it knew that if it were found to have acted in bad

---

9. St. Paul does not appear to dispute the contention of The Birth Center that its private attorney sent St. Paul "dozens" of written threats stating

faith, it would be liable for punitive damages as well as the amount of the excess verdict. 42 Pa.C.S.A. § 8371. It, therefore, appears that St. Paul paid the excess in an attempt [10] to avoid a punitive damages award.

The purpose of damages in contract actions is to return the parties to the position they would have been in but for the breach. *Gedeon,* 188 A.2d at 322 n. 5. The relationship and dispute between The Birth Center and St. Paul flow from their contract. *Gray,* 223 A.2d at 12. "Breach of . . . [the] obligation [to act in good faith] constitutes a breach of the insurance contract for which an action in assumpsit will lie." *Id.* Therefore, where an insurer acts in bad faith, the insured is entitled to recover such damages sufficient to return it to the position it would have been in but for the breach. St. Paul's payment of the excess verdict does not bar The Birth Center's claim for compensatory damages because The Birth Center was able to prove that St. Paul's bad faith conduct was a substantial factor in The Birth Center suffering damages in addition to the excess verdict.

Furthermore, there is no reason to limit damages to the amount of the verdict where the insured can show that the insurer's bad faith conduct caused it additional damages. The insurer's conduct is not the subject of the underlying court action against the insured and, except for the amount of the excess verdict, damages stemming from the insurer's bad faith conduct are not resolved by the action against the insured. Where, as here, the insured can prove that it sustained damages in excess of the verdict, the insurer's payment of the excess has little to do with the insured's damages. Accordingly, the insurer's payment of the excess should not free it from other known or foreseeable damages it has caused its insured to incur.

### *D'Ambrosio Does Not Bar The Birth Center's Claim*

Next, St. Paul contends that *D'Ambrosio,* 494 Pa. 501, 431 A.2d 966, bars Birth Center's claim for compensatory

that if St. Paul did not pay the excess verdict, Birth Center would sue St. Paul for its bad faith conduct. Appellee's Br. at 10.

10. It was a successful one. The jury did not award punitive damages.

damages. We disagree. Our holding in *D'Ambrosio* was a narrow one. *D'Ambrosio* involved a claim by an insured that his insurer acted in bad faith by failing to explain why it was declining to pay a property damages claim. The insured asserted that the insurer was implicitly stating that the claim was fraudulent. We described the insured's bad faith claim as "dubious." *Id.* at 971. We held that where the allegations in the complaint failed to show how the insurer acted in bad faith, we would not allow the insured to recover punitive damages or damages for emotional distress on his *trespass* cause of action. The contractual cause of action was never before the Court.[11] In fact, we expressly stated that, in an appropriate case, an insured could recover compensatory damages based on a contract cause of action, because of an insurer's bad faith conduct. We explained:

> The possibility cannot be ruled out that emotional distress damages may be recoverable on a *contract* where, for example, the *breach* is of such a kind that serious emotional disturbance was a particularly likely result. . . . The present record falls far short of establishing such conduct.

431 A.2d at 970 (internal citations, quotations omitted and emphasis added). Similarly, in Chief Justice Nix's concurring opinion, he stated:

> In addition to the deterrent provisions of the Unfair Insurance Practices Act ... appellant was also in a position to seek relief under a theory of *breach of contract,* or by pursuing the common law tort of deceit. . . . I do not accept the dissent's implicit premise that these existent remedies are inadequate to make appellant whole.

*Id.* at 973–974 (internal citations omitted emphasis added). Because nothing in *D'Ambrosio* bars a party bringing a bad faith action sounding in contract from recovering damages that are otherwise available to parties in contract actions, we

---

11. We observed with respect to the assumpsit claim that: "[t]his count is not now before us. The trial court has directed appellee to file its answer". 431 A.2d at 967.

reject St. Paul's argument that *D'Ambrosio* bars Birth Center's claim.[12]

### 42 Pa.C.S.A. § 8371 Does Not Prohibit the Award of Compensatory Damages

In St. Paul's third argument, it incorrectly asserts that compensatory damages may not be awarded when an insurer's bad faith conduct causes the insured to incur actual damages, because the damages are not mentioned in 42 Pa. C.S.A. § 8371.[13] While The Birth Center may not recover compensatory damages based on Section 8371, that Section does not alter The Birth Center's common law contract rights. We begin with the words of the statute. Section 8371 provides:

§ 8371. Actions on insurance policies

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

The statute does not prohibit the award of compensatory damages. It merely provides an additional remedy and authorizes the award of additional damages.[14] Specifically, the

12. Justice Cappy, in his concurring opinion in *Johnson v. Beane*, 541 Pa. 449, 664 A.2d 96 at 101–102 (1995), correctly examined this issue and observed that at least since this Court's 1957 decision in *Cowden*, 389 Pa. 459, 134 A.2d 223 common law contract rights permit an insured to recover compensatory damages in bad faith actions.

13. Section 8371 is in Article 42 subchapter G. The legislature entitled Subchapter G "Special Damages". The use of the adjective "special" to modify the word damages implies that not all types of damages that are available are discussed within the provisions within the subchapter.

14. This case does not require that we resolve the question of whether Section 8371 creates an independent cause of action or an additional

statute authorizes courts, which find that an insurer has acted in bad faith toward its insured, to award punitive damages, attorneys' fees, interest and costs. *Id.* The statute does not reference the common law, does not explicitly reject it, and the application of the statute is not inconsistent with the common law. Consequently, the common law remedy survives. *Metropolitan Property and Liability Insurance Co. v. Insurance Commissioner of Pennsylvania,* 525 Pa. 306, 580 A.2d 300 (1990). In *Metropolitan Property,* we rejected an insured's argument that the Unfair Insurance Practices Act abrogated the insurer's contractual, common law right of rescission. *Id.* at 302–303. We explained that because the statute did not refer to the common law remedy of rescission and its concurrent application was not inconsistent with the statute that the legislature did not intend to preclude the remedy. *Id.* We determined that:

> Under the ... [Statutory Construction Act. 1 Pa.C.S. § 1921 et seq] an implication alone cannot be interpreted as abrogating existing law. The legislature must affirmatively repeal existing law or specifically preempt accepted common law for prior law to be disregarded.
>
> * * *
>
> [Because 40 Pa.C.S. § 1171.5 (the provision at issue in *Metropolitan Property* ]) makes no reference to the common law right to rescission ... [s]much an omission cannot be interpreted as an intention to foreclose such a long-standing right.

*Id.* at 311, 580 A.2d 300.

Similarly, in *Rahn v. Hess,* 378 Pa. 264, 106 A.2d 461 (1954), we stated: "statutes are never presumed to make any innovation in the rules and principles of the common law or prior existing law beyond what is expressly declared in their provisions." *Id.* at 270, 106 A.2d 461. Indeed, in the context of determining whether 42 Pa.C.S.A. 8371 altered the burden of proof, the Third Circuit applied Pennsylvania law and explained that because the legislature did not expressly alter

remedy. We make no comment on that issue here because the issue is not squarely before us.

prior law, it did not intend to change it. *Polselli v. Nationwide Mutual Fire Insurance Co.*, 23 F.3d 747, 752 (3d Cir. 1994). There, the court observed that:

> In enacting a statute, the legislature is presumed to have been familiar with the law, as it then existed and the judicial decisions construing it. See *Raymond v. School Dist.*, 186 Pa.Super. 352, 142 A.2d 749 (1958). Had the legislature intended to make changes in the law with respect to the burden of persuasion necessary to prove bad faith, it could have done so expressly. See *Harka v. Nabati*, 337 Pa.Super. 617, 487 A.2d 432, 435 (1985). By failing to articulate any changes, the legislature implicitly acknowledged that the existing standards remain applicable.

23 F.3d at 751. The same reasoning applies where, as here, the legislature did not expressly prohibit the continued award of compensatory damages when an insurer's bad faith conduct causes them.

Therefore, contrary to St. Paul's contention, Section 8371 does not prohibit courts from awarding compensatory damages that are otherwise available.[15] In Section 8371, the

15. Before the enactment of Section 8371, courts could award compensatory damages in contract cases when the damages were known or foreseeable and subject to calculation. *R.I. Lampus Co. v. Neville Cement Products Corp.*, 474 Pa. 199, 378 A.2d 288 (1977); *Cowden*, 389 Pa. 459, 134 A.2d 223. In *R.I. Lampus*, we quoted Professor Corbin for the following proposition of law:

> All that is necessary, in order to charge the defendant with the particular loss, is that it is one that ordinarily follows the breach of such a contract in the usual course of events, or that reasonable men in the position of the parties would have foreseen as a probable result of breach.

378 A.2d at 291, quoting 5 A. Corbin, *Corbin on Contracts* § 1010 at 79 (1964). The same year the legislature enacted Section 8371 we were not breaking new ground when we stated, "in addition to allowing compensatory damages under [the Uniform Commercial C]ode, Pennsylvania allows compensatory damages in the form of lost profits to be recovered." *AM/PM Franchise Association v. Atlantic Richfield Co.*, 526 Pa. 110, 584 A.2d 915, 920 (1990). Indeed, by the time that the legislature enacted Section 8371, it had long been axiomatic that compensatory damages were available in contract actions where the damages were the foreseeable result of the breach. *Delahanty v. First Pennsylvania Bank N.A.*, 318 Pa.Super. 90, 464 A.2d 1243 (1983). The *Delahanty* court observed that:

legislature granted the court additional authority to award punitive damages, interest, costs and attorneys' fees. The fact that the statute authorized courts to award these damages does not prohibit them from granting other remedies that they theretofore had the power to award without the grant of additional authority.

Finally, St. Paul's argument that damages not mentioned by Section 8371 are not available is inconsistent with St. Paul's admission that other damages, not listed in Section 8371, remain viable. Appellant's Reply Br. at 3. Notwithstanding that Section 8371 does not provide that courts may require an insurer to pay an excess verdict when it refuses, in bad faith, to settle a case, St. Paul admits, as it must,[16] that such an award is permissible. St. Paul states:

> it has long been held in this Commonwealth that when an insurance company fails to settle a third-party claim against its insured, the insurer can be liable for the full amount of any excess verdict, if the decision not to settle was made in bad faith. [St. Paul also admits that] this right has been held to be contractual in nature; it can be enforced by an

> It is well settled law in Pennsylvania that loss of profits are recoverable upon proper proof in contract ... The general rule of law applicable for loss of profits in both contract and tort actions allows such damages where (1) there is evidence to establish them with reasonable certainty, (2) there is evidence to show that they were the proximate consequence of the wrong; and, in the contract actions, that they were reasonably foreseeable.

*Id.* at 1258. Because compensatory damages were available at the time the legislature enacted Section 8371, and that Section does not provide that the court may no longer award compensatory damages, those damages remain available.

**16.** An insurer, who acts in bad faith by unreasonably refusing to settle a case, may be liable for the full amount of a verdict notwithstanding that the verdict exceeds the insured's policy limits. *Cowden*, 389 Pa. 459, 134 A.2d 223. In *Cowden*, we stated that an insurer:

> may be liable for the entire amount of a judgment secured by a third party against the insured, regardless of any limitation in the policy, if the insurer's handling of the claim, including a failure to accept a proffered settlement, was done in such a manner as to evidence bad faith on the part of the insurer in the discharge of its contractual duty.

*Id.* at 224. See also *Gray v. Nationwide Insurance Co.*, 422 Pa. 500, 223 A.2d 8 (1966).

action in assumpsit; and it is assignable to the injured third party.

Appellant's Reply Br. at 3. St. Paul, thereby, concedes that an insurer who acts in bad faith may be subject to damages other than those set forth in Section 8371. Accordingly, just as courts may require an insurer to pay an excess verdict even though Section 8371 does not mention excess verdict liability, the absence of compensatory damages from Section 8371 does not alter the authority of courts to award compensatory damages.

Requiring insurers, who act in bad faith, to pay excess verdicts protects insured from liability that, absent the insurer's bad faith conduct, the insured would not have incurred.[17]

17. The rationale for requiring an insurer to pay an excess verdict derives from the insurer's right to control the defense of an action. *Cowden*, 134 A.2d at 228. Where the insurance company takes control of the decision to settle or litigate actions brought by third parties, the insurance company owes its policyholder a fiduciary duty, among other things, to engage in good faith settlement negotiations. *Gedeon v. State Farm Mutual Automobile Insurance Company*, 410 Pa. 55, 188 A.2d 320 (1963). In *Gedeon*, we stated that:

> by asserting in the policy the right to handle all claims against the insured, including the right to make a binding settlement, the insurer assumes a fiduciary position towards the insured and becomes obligated to act in good faith and with due care in representing the interests of the insured.

*Id.* at 322. Because of the insurer's controlling role in the litigation, the insurer enters a fiduciary relationship with its insured and accepts the responsibility to protect the interests of its insured. *Gray v. Nationwide Mutual Insurance Company*, 422 Pa. 500, 223 A.2d 8 (1966) (holding that an insured's right to recover an award in excess of his policy limits from his insurer, when the insurer refuses to settle a claim against the inured in bad faith, was assignable).

Notwithstanding the insurer's contractual duty to its insured, the interests of insurers and their insureds are not always consistent and are frequently in conflict with one another. Indeed, an insured's interests are particularly at risk when a plaintiff expresses a willingness to settle for the policy limits. When it becomes clear that an insurer could settle a third-party claim against its insured for the limits of the policy, and thereby release its insured from any worry about an excess verdict, the insurer must be vigilant to ensure that it has a reasonable basis to try the case and that it is not breaching its fiduciary duty to its insured, based upon a small chance of a defense verdict. *Cowden*, 134 A.2d at 228.

An insured's interests are particularly in jeopardy under the forgoing facts because whether the insurer settles for the policy limits or looses

The insured's liability for an excess verdict is a type of compensatory damage for which this court has allowed recovery. Therefore, when an insurer breaches its insurance contract by a bad faith refusal to settle a case, it is appropriate to require it to pay other damages that it knew or should have known the insured would incur because of the bad faith conduct.

The dissent would hold that an insurer's bad faith refusal to settle a claim against its insured does not give rise to a contract cause of action. For the reasons set forth in this opinion, we respectfully disagree. However, we respond to point out that the characterization of the claim by the dissent has no bearing on the outcome of this particular case. Whether Birth Center's cause of action sounds in contract or in tort, the jury found by clear and convincing evidence that St. Paul acted in bad faith and that its actions were a substantial factor in bringing about harm to the Birth Center totaling $700,000.00 in compensatory damages. In appropriate circumstances, compensatory damages are available in both contract and tort causes of action. Indeed, generally, compensatory damages are easier to recover in tort actions than in contract actions. Consequently, in this case, which does not involve a statute of limitations issue, the dissent's assertion that the claim should sound in tort instead of contract is irrelevant.

The only applicable issue raised by the dissent is whether the Bad Faith Statute, 42 Pa.C.S.A. § 8371, bars the recovery of compensatory damages. For the reasons we have discussed, we are not persuaded by the dissent. To the contrary, the provision does not prohibit the award of compensatory damages; it merely provides a basis to award additional damages. The statute does not reference the common law, does not explicitly reject it, and the application of the statute is not inconsistent with the common law. Accordingly, the

at trial, its risk is the same; in both instances, and absent bad faith, all it would have to pay would be the policy limits. *Id.* In such a situation, a faithless insurer would have nothing to loose by trying the case; it might as well take the risk and hope for a defense verdict. At the same time, the insured would have no reason to risk a trial. *Cowden,* 134 A.2d at 223.

remedy survives. To hold otherwise as the dissent does would read a statute—that·authorizes additional damages—to prohibit the award of compensatory damages, which were already within the power of the courts to award. We cannot countenance such a result because it directly conflicts with the one the legislature intended.

## CONCLUSION

Today, we hold that where an insurer acts in bad faith, by unreasonably refusing to settle a claim, it breaches its contractual duty to act in good faith and its fiduciary duty to its insured. Therefore, the insurer is liable for the known and/or foreseeable compensatory damages of its insured that reasonably flow from the insurer's bad faith conduct. Accordingly, we affirm the decision of the Superior .Court, reinstate the jury's verdict and remand this case to the trial court for a determination of The Birth Center's entitlement to interest, reasonable attorneys' fees and costs pursuant to 42 Pa.C.S.A. § 8371.

NIGRO, Justice, files a concurring opinion.

ZAPPALA, Justice, files a dissenting opinion in which CASTILLE, Justice joins.

NIGRO, Justice (concurring).

I agree with the majority that the Superior Court properly reversed the trial court's order and reinstated the jury's award granting The Birth Center $700,000.00 in consequential damages.[1] In addition, I agree with the majority that The

---

1. While the damages awarded may also be referred to as compensatory damages, they are more ¡specifically defined as consequential. Compensatory damages are damages meant to place the injured party in the place he was prior to the injury. BLACK's LAW DICTIONARY 390 (6th ed.1990). Compensatory damages consist of both "general" and "consequential" or "special" damages. While general damages compensate the injured party for the immediate injury or loss sustained, consequential damages are damages that flow from the consequences of the direct injury. *Id.* To recover consequential damages, a litigant must prove that they were "reasonably foreseeable" to the parties at the time they entered into the contract. *AM/PM Franchise Assoc. v. Atlantic Rich-*

Birth Center's claim for consequential damages sounds in contract law. *See D'Ambrosio v. Pennsylvania Nat'l Mutual Ins. Co.*, 494 Pa. 501, 431 A.2d 966 (1981); *Gray v. Nationwide Mutual Ins. Co.*, 422 Pa. 500, 223 A.2d 8 (1966). I nevertheless write separately to assert my view that, unlike Justice Zappalla, I believe that the law in this Commonwealth establishes that there are two separate "bad faith" claims that an insured can bring against an insurer—a contract claim for breach of the implied contractual duty to act in good faith, and a statutory bad faith tort claim sounding in tort under 42 Pa.C.S. § 8371. Pursuant to the contract claim, an insured may recover traditional contract damages, including compensatories. Pursuant to the statutory claim, however, the insured may recover only those damages specifically set forth in 42 Pa.C.S. § 8371, *i.e.*, punitive damages, attorney fees, court costs and interest.

Although historically the case law in this Commonwealth has been less than clear as to the nature of the common law "bad faith" claim against an insurer, *i.e.*, whether it sounds in tort or contract,[2] I believe that any ambiguity in that regard was settled by *D'Ambrosio*, which explicitly stated that there is no common law bad faith *tort* claim. 431 A.2d at 970. *D'Ambrosio*, however, did not address the viability of the bad faith *contract* claim, which has its roots in the 1952 case of *Perkoski v. Wilson*, 371 Pa. 553, 92 A.2d 189 (1952)(first recognizing assumpsit action for bad faith), and was reaffirmed by this Court in *Gray*. Accordingly, *D'Ambrosio* left the long-recognized contractual bad faith claim undisturbed.

*field*, 526 Pa. 110, 584 A.2d 915, 920–21 (1990). In the instant case, the general damage suffered by The Birth Center was its liability for the excess verdict. However, because St. Paul paid the excess voluntarily, the excess was not part of The Birth Center's damages claim. Rather, The Birth Center sought consequential damages, consisting of, among other things, lost business and lost clients. The trial court properly charged the jury that it could award such consequential damages if it found that they were "reasonably foreseeable at the time [the parties] made the contract." N.T. 5/10/96, at 247.

**2.** *Compare Cowden v. Aetna Casualty & Surety Co.*, 389 Pa. 459, 134 A.2d 223 (1957)(considering a bad faith claim asserted in trespass), *with Gray* 422 Pa. 500, 223 A.2d 8 (characterizing bad faith claim as one in assumpsit),

By subsequently enacting 42 Pa.C.S. § 8371, the General Assembly filled the gap that we had identified in *D'Ambrosio* with a statutory cause of action in tort for bad faith.[3] By virtue of § 8371, insureds may now supplement the breach of contract damages that they can obtain through their bad faith contract action by also bringing a claim under § 8371 for the specific damages authorized in that statute.

ZAPPALA, Justice, (dissenting).

I must respectfully dissent on the grounds that a claim for bad faith refusal to settle sounds in tort, not in contract. Therefore, the only viable action available to Appellee regarding Appellants' bad faith refusal to settle is an action in tort. The remedies available to Appellee consist of the recovery of: (1) the excess verdict pursuant to common law, *see Cowden v. Aetna Casualty and Surety Co.*, 389 Pa. 459, 134 A.2d 223 (1957); and (2) interest, punitive damages, court costs and attorney fees pursuant to the bad faith statute, *see* 42 Pa.C.S. § 8371. Since consequential damages are not available under common law or the bad faith statute, they are barred. I would therefore reverse the order of the Superior Court.

In *Gray v. Nationwide Mutual Insurance Co.*, 422 Pa. 500, 223 A.2d 8 (1966), this Court held that an insured's right to recover an award in excess of his policy limits from his insurer, as a result of the insurer's bad faith refusal to settle the underlying claim against the insured, was assignable. Although this general proposition of law, that a claim for bad faith refusal to settle seeking to recover an excess verdict is assignable, is sound and remains good law, I believe that in the course of reaching the result in *Gray*, this Court erroneously characterized an insured's cause of action for bad faith

3. I conclude that 42 Pa.C.S. § 8371 sounds in tort both because it appears to have been enacted in response to *D'Ambrosio* and because it permits the insured to recover punitive damages, which are typically a remedy only in tort actions. *See Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 555 A.2d 800, 803 (1989); *see also AM/PM Franchise Assoc.*, 584 A.2d at 927 (holding that punitive type relief may not be awarded in contract action).

refusal to settle as an action in assumpsit.[1]  *Gray*, 223 A.2d at 11.

Under a liability insurance contract, in addition to any specific obligations undertaken by the insurer in exchange for the policy premium, an insurer undertakes three obligations: (1) the insurer agrees to indemnify the insured against liability covered by the policy;  (2) the insurer agrees to defend the insured against any suits arising under the policy;  and (3) the insurer assumes a fiduciary responsibility to the insured and becomes obligated to act in good faith and with due care in representing the interests of the insured.  *See Gedeon v. State Farm Mutual Automobile Insurance Co.*, 410 Pa. 55, 188 A.2d 320 (1963).[2]  It is hornbook law that a breach of either the duty to indemnify or the duty to defend constitutes a breach of a promise set forth in the liability insurance contract and gives rise to a cause of action *ex contractu;* a breach of the duty to act in good faith arises from a breach of the fiduciary duty growing out of the liability insurance contract and gives rise to a cause of action *ex delicto.*  *See Gedeon* (action sounding in assumpsit claiming breach of covenant to defend); *Cowden* (action sounding in trespass claiming bad faith refusal to settle).  However, this Court's characterization in *Gray,* of a claim for bad faith refusal to settle as an action in assumpsit, conflicts directly with the characterization of a claim for bad faith refusal to settle as a tort giving rise to an action *ex delicto.*

The *Gray* case originated in the Philadelphia County Common Pleas Court as a trespass action brought by Robert Gray against Robert MacLatchie for personal injuries and property loss resulting from an automobile accident.  At the time of the

---

**1.**  Assumpsit is defined as: "A common law form of action which lies for the recovery of damages for the non-performance of a parol or simple contract;  or a contract that is neither of record nor under seal. . . . The action of *assumpsit* differs from *trespass* and *trover,* which are founded on a tort, not upon a contract. . . ." BLACK'S LAW DICTIONARY 122 (6th ed. 1991) (emphasis in original).

**2.**  Although *Gedeon* concerned the insurer's duties in the context of an automobile liability policy, these duties are not altered where the subject policy is for professional liability protection.

accident, MacLatchie was insured by Nationwide Mutual Insurance Company under an automobile liability policy, the coverage of which was limited to $5,000. Nationwide defended MacLatchie in the action. Gray subsequently obtained a $15,000 jury-verdict against MacLatchie. After Nationwide tendered the policy limits to Gray, Gray demanded the balance of the judgment from MacLatchie, who then assigned all of his rights against Nationwide to Gray.

On the basis of the assignment by MacLatchie, Gray filed an assumpsit action in the common pleas court against Nationwide to recover the balance of the judgment, claiming that Nationwide had acted in bad faith by refusing to settle with Gray for an amount within MacLatchie's policy limits. Nationwide's preliminary objections in the nature of a demurrer were sustained and Gray's complaint was dismissed. Gray appealed to the Superior Court *en banc*, which affirmed the trial court's order by an equally divided court. *Gray v. Nationwide Mutual Insurance Company*, 207 Pa.Super. 1, 214 A.2d 634 (1965). Judge Wright concluded in his opinion supporting the affirmance of the order that MacLatchie's claim against Nationwide was not assignable to Gray as a matter of law:

> Breach of an insurer's obligation to act in good faith and with due care in representing the interests of the insured creates a cause of action in tort, not in assumpsit. A claim of the instant nature is not assignable before verdict: *Sensenig v. Pa. Railroad Co.*, 229 Pa. 168, 78 A. 91 [ (1910) ]; *Seaboard Commercial Corp. v. Bardell*, 49 Pa. D. & C. 300 [ (1944) ].

214 A.2d at 635.[3]

On appeal, this Court stated:

**3.** Although Judge Wright was correct in characterizing the action as sounding in tort, this Court's decision in *Sensenig* did not control the issue of assignability. In *Sensenig*, this Court held that an action in tort, to recover unliquidated damages, was not capable of assignment. *See also Sniderman v. Nerone*, 136 Pa.Super. 381, 7 A.2d 496 (1939) (holding that unliquidated claim for damages for personal injuries is not assignable nor subject to attachment), *aff'd per curiam*, 336 Pa. 305, 9 A.2d 335 (1939). Gray's claim against Nationwide, however, was not

Our task is to determine whether MacLatchie, the insured, has a cause of action in assumpsit or in tort against the insurer for its wrongful refusal to settle. In *Cowden v. Aetna Casualty and Surety Company,* 389 Pa. at 468, 134 A.2d 223, the late Mr. Chief Justice Charles Alvin Jones stated: "It is established by the greatly preponderant weight of authority in this country, that an insurer against public liability for personal injury may be liable for the entire amount of a judgment secured by a third party against the insured, regardless of any limitation in the policy, if the insurer's handling of the claim, including a failure to accept a proffered settlement, was done in such a manner as to evidence bad faith on the part of the insurer *in the discharge of its contractual duty.*" (Emphasis added). Giving the reason for this rule, Mr. Chief Justice Jones continued: "And, in *Weiner v. Targan,* 100 Pa.Super. 278, 284, it was recognized that the *contractual relationship* under an indemnity policy was one requiring 'a high degree of good faith in the conduct of the indemnity company's counsel generally * * *.'" 389 Pa. at 469, 134 A.2d at 228. (Emphasis added). In *Gedeon v. State Farm Mutual Insurance Company,* 410 Pa. 55, 188 A.2d 320 (1963), Mr. Justice Cohen elaborated on the duties of the insurer to his insured: "Under a typical automobile liability insurance policy, such as the one before us, the insurer undertakes *three distinct types of obligations,* each of which involves different elements of proof to establish *breach* thereof, and from the *breach* of which different measures of recovery result." 410 Pa. at 58, 188 A.2d 320. (Emphasis added). "Thirdly, by asserting in the policy the right to handle all claims against the insured, including the right to make a binding settlement, the insurer assumes a fiduciary position towards the insured and *becomes obligated* to act in good faith and with due care in representing the interests of the insured." 410 Pa. at 59, 188 A.2d 320. (Emphasis added). **We believe that this recent case law, employing contrac-**

one for unliquidated damages. Gray sought a sum certain: the amount of the excess verdict.

**tual terms for the obligation of the insurer to represent in good faith the rights of the insured, indicates a breach of such an obligation constitutes a breach of the insurance contract for which an action in assumpsit will lie.**

*Gray,* 223 A.2d at 11 (emphasis added).

The glaring error in this reasoning is that the "recent case law, employing contractual terms for the obligation of the insurer to represent in good faith the rights of the insured" which the *Gray* court found dispositive regarding whether the action lay in assumpsit or tort, does not lead logically to the conclusion that the bad faith claim lies in assumpsit. Neither *Cowden* nor *Gedeon* indicate that an action claiming bad faith refusal to settle sounds in contract.[4] In *Cowden,* this Court found that, in a *trespass* action claiming bad faith refusal to settle, the insurer could be liable for the entire amount of the excess verdict if the insurer's handling of the claim evidenced bad faith. This Court's decision in *Gedeon* concerned an *assumpsit* action claiming a breach of the covenant to defend. Neither case can be read as supplying any sound legal reasoning for construing a claim for bad faith refusal to settle as sounding in assumpsit.

Because a claim for bad faith refusal to settle sounds in tort, not in contract, the only remedies available to Appellee consist of the recovery of: (1) the excess verdict pursuant to common law; and (2) interest, punitive damages, court costs and attorney fees pursuant to the bad faith statute. Since consequential damages are not recoverable under common law or the bad faith statute, they are barred. *See D'Ambrosio v. Pennsylvania National Mutual Insurance Co.,* 494 Pa. 501, 431 A.2d 966 (1981).

4. *Weiner v. Targan,* 100 Pa.Super. 278 (1930), concerned a petition to open a judgment, averring that the judgment was procured by fraud. The Superior Court reversed the trial court's denial of the petition to open. The Superior Court observed that when a casualty company assumes the defense of an action pursuant to the terms of its policy, it is held to a strict rule of good faith in conducting the defense, and therefore, where a casualty company commits fraud in the course of conducting the defense, it should be held liable for the damages naturally resulting therefrom.

The order of the Superior Court should therefore be reversed.

CASTILLE, Justice, joins this dissenting opinion.