# Reliant Healthcare Management, Inc v. Ashton Hall

2

*Mark L. Rhoades, Sandra J. Doyle, Amy L. Blackmore, Evan Barenbaum* and *Rebecca Field Emerson,* for plaintiff.

*Jacob N. Snyder, Colin J. O'Boyle* and *Marvin L. Wilenzik,* for defendants.

BERNSTEIN, *J.,* February 22, 2011—Defendants Ashton Hall, Inc. and Stanley Segal appeal the orders of this court and the Jury-rendered Verdict listed below:

1. Order dated March 16, 2009;

2. Order dated July 6, 2009;

3. Order dated August 3, 2009;

4. Order dated August 26, 2009;

5. Order and opinion dated December 18, 2009;

6. Order dated April 21, 2010;

7. Order dated June 14, 2010;

8. Verdict rendered July 27, 2010;

9. Order dated September 11, 2010;

10. Order dated September 13, 2010;

11. Order dated October 15, 2010;

12. Order dated November 24, 2010.

For the reasons explained in the attached memoranda opinions below, this court respectfully suggests that all orders and the verdict should be affirmed on appeal.

1. *Order Dated March 16, 2009*

4

## MEMORANDUM OPINION

Defendants Ashton Hall, Inc., and Stanley Segal appeal the order of this court dated March 16, 2009 sustaining in part and denying in part the preliminary objections of plaintiff Reliant Healthcare Management, Inc. to the counterclaim of defendants Ashton Hall, Inc. and Stanley Segal.

On April 16, 2007, defendants Ashton Hall and Stanley Segal, ("Ashton Hall" and "Segal,") entered into a "management agreement" with plaintiff Reliant Healthcare Management, Inc. ("Reliant.") Pursuant to the management agreement, Reliant became manager of the Ashton Hall Nursing Home, a business owned by defendants Ashton Hall and Segal.

On January 16, 2008, Segal terminated Reliant as manager of the nursing home, and Reliant filed suit against Ashton Hall and Segal. In the complaint, Reliant asserted that Ashton Hall and Segal had improperly terminated Reliant as manager of the nursing home, and asserted against Ashton Hall and Segal five separate claims sounding in breach of contract, tortious interference with business relations, defamation, fraud and conspiracy.[1]

On August 15, 2008, Ashton Hall and Segal filed an answer with new matter and counterclaim to the complaint of Reliant. The answer with new matter and counterclaim contained twenty-five (25) counts asserted against Reliant. Below are all claims asserted by Ashton Hall and Segal in their counterclaim:

---

1. Complaint, Docket No. 0801-3083.

| Count # | Description |
|---|---|
| 1 | Breach of Contract |
| 2 | Breach of Fiduciary Duty |
| 3 | Conversion |
| 4 | Fraud |
| 5 | Intentional Misrepresentation |
| 6 | Negligent Misrepresentation |
| 7 | Business Disparagement |
| 8 | Defamation |
| 9 | Intentional Interference with Business |
| 10 | Intentional Interference with Business |
| 11 | Tortuous [sic] Inference [sic] with Business |
| 12 | Tortuous [sic] Inference [sic] with Business |
| 13 | Breach of the Covenant of Good Faith and Fair Dealing |
| 14 | Bad Faith |
| 15 | Accounting |
| 16 | Contribution and Indemnification |
| 17 | Disgorgement of management Fees |
| 18 | Disgorgement of Revenue |
| 19 | Fraud |
| 20 | Intentional Misrepresentation |
| 21 | Negligent Misrepresentation |

22 Intentional Interference with Business

23 Intentional Interference with Business

24 Tortuous [sic] Inference [sic] with Business

25 Tortuous [sic] Inference [sic] with Business

On January 9, 2009, Reliant filed preliminary objections to the counterclaim of Ashton Hall and Segal. On March 16, 2009, this court sustained in part the preliminary objections of Reliant, and dismissed twenty of the twenty-five claims asserted by Ashton Hall and Segal in their counterclaim. Only the claims of breach of contract (1st count), breach of fiduciary duty (2nd count), intentional misrepresentation (5th count), negligent misrepresentation (6th count) and contribution and indemnification (16th count), survived the preliminary objections. Defendants Ashton Hall and Segal have appealed the order dated March 16, 2009 dismissing all but five of the claims asserted in their counterclaim.

## DISCUSSION

The standard for review for preliminary objections requires that all material facts in the complaint, "as well as all inferences reasonably deducible therefrom, be admitted as true...." The question presented by preliminary objections is whether, on the facts averred, the law holds with certainty that no recovery is possible. In the presence of doubt, the preliminary objections should be overruled.[2]

I. *The Claims Asserting Intentional and Tortious*

---

2. *Emples, Ins. of Wausau v. DOT*, 581 Pa. 381, 389, 865 A.2d 825, 830 (Pa. 2005).

*Interference with Business (Counts 9-12, 22-25) Were Legally Insufficient.*

The elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are as follows:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.[3]

[A] prospective contractual relationship.... is something less than a contractual right, something more than a mere hope.... There must be something more than a mere hope or the innate optimism of the salesman.[4]

Only paragraphs 155 and 220 of defendants' counterclaim contained language remotely implying interference with Ashton Hall's existing or prospective business relations. Paragraph 155 stated:

Defendant Segal was able to secure financing without giving up 51 percent of the Ashton Hall Facility which

---

3. *Strickland v. University of Scranton,* 700 A. 2d 979, 985 (Pa. S - per. 1997).
4. *Phillips v. Selig,* 959 A.2d 420, 428 2008 (Pa. Super. 2008).

financing was withdrawn when the Ashton Hall Facility financial statements prepared by [Reliant] showed a substantial loss.

This allegation did not explain why Reliant, as manager of the Ashton Hall Nursing Home, lacked privilege to publish the nursing home's financial statements. As stated, this allegation was insufficient to maintain a claim for interference with business.

The other language remotely implying interference with business relations appeared in paragraph 220 of the counterclaim. That paragraph stated that "during negotiations between Ashton Hall and a third party for the sale of Ashton Hall, [Reliant] took affirmative steps to stop and/or delay the sale...."[5] This language was vague, failed to identify any prospective buyer of the nursing home, failed to state any material facts, and provided a mere conclusory legal opinion about defendants' hope to sell the Ashton Hall Facility. The claims asserting intentional and tortious interference with business, asserted in Counts 9-12 and 22-25, were legally insufficient and were properly dismissed.

II. *The Claims Asserting Fraud, Intentional and Negligent Misrepresentation (Counts 4, 19-21) Were not Stated With Sufficient Specificity.*

[T]he Pennsylvania Rules of Civil Procedure require that fraud be averred with particularity.... Thus, a party raising a claim of fraud must set forth in its pleadings specific facts to support the alleged fraud.[6]

---

5. Counterclaim of defendants Ashton Hall and Segal, ¶220.
6. *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1072 (Pa. Super. 2003), citing Pa.R.C.P. 1019(b)).

In Pennsylvania, fraud and intentional misrepresentation contain the following elements:

(1) a representation;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

(4) with the intent of misleading another into relying on it;

(5) justifiable reliance on the misrepresentation; and

(6) the resulting injury was proximately caused by the reliance.[7]

Negligent misrepresentation requires proof of:

(1) a misrepresentation of a material fact;

(2) made under circumstances in which the misrepresenter ought to have known its falsity;

(3) with an intent to induce another to act on it; and;

(4) which results in injury to a party acting in justifiable reliance on the misrepresentation.[8]

The only language remotely suggesting fraud or misrepresentation appeared in paragraphs 350, 360, and 369-370 of the counterclaim. The language in these paragraphs asserted that Reliant made misrepresentations "knowingly and fraudulently," or "intentionally" and

---

7. *Gibbs v. Ernst*, 538 Pa. 193, 207-8, 647 A.2d 882, 889 (Pa. 1994).

8. *Bortz v. Noon*, 556 Pa. 489, 500, 729 A.2d 555, 561 (Pa. 1999).

"negligently," to induce Ashton Hall and Segal to enter into the management agreement, "even though [Reliant] had no intention of complying with the agreement."[9]

This language did not explain with sufficient and factual particularity the nature of the fraud or misrepresentations. These paragraphs did not allege any specific improper or untrue representations involving facts that were material to the transaction at hand. Since no facts were alleged, the court could not infer whether the claims had any foundation.[10] The claims of fraud, intentional and negligent misrepresentation asserted in counts 4 and 19-21 of the counterclaim were not stated with any sufficient particularity and were properly dismissed.

III. *The Claims Asserting Business Disparagement and Defamation were Legally Insufficient.*

In the preliminary objections to the counterclaim of defendants Ashton Hall and Segal, Reliant asserted that the claims of defamation and business disparagement are legally insufficient. Reliant argued that the claims of defamation and business disparagement were legally insufficient because the counterclaim did not state with sufficient particularity any defamatory statements allegedly made by Reliant, and did not identify any third parties to whom the alleged statements were made.

---

9. Counterclaim of defendants Ashton Hall and Segal, ¶¶350, 360, 369-370.

10. "Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation or offered simply to harass the opposing party… ." *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1072 (Pa. Super. 2003) (citing *Bata v. Central Penn National Bank of Philadelphia*, 423 Pa. 373, 224 A.2d 174 (Pa. 1966)).

Although it is preferable that the exact [defamatory] words be stated in the complaint, often the exact words are not known. However, although the exact words need not be stated, the complaint must specify the substance of the spoken words; the purport of the spoken words is necessary. [When] the complaint does not specify the words in substance used by the defendant, it is defective. It is also defective for failure to identify any persons to whom the alleged statements were made.[11]

In this case, the counterclaim of Ashton Hall and Segal merely stated:

[U]pon information and belief, [Reliant] has disparaged…Ashton Hall's business practices and reputation…in that they have deterred customers from conducting business with…Ashton Hall…. The statements published by [Reliant] have imputed the business reputation of…Ashton Hall…and the customers [of Ashton Hall] would understand that the statements apply to…Ashton Hall."[12]

The counterclaim of Ashton Hall and Segal did not specify any words in substance or even concept allegedly conveyed by Reliant, nor did it identify any persons to whom the alleged statements were made. The claims asserting business cisparagement and defamation asserted in counts 7 and 8 of defendants' counterclaim were defective. Those claims were properly dismissed.

IV. *Defendants Could not Assert the Claims of Breach of the Implied Covenant of Good Faith and Bad Faith.*

---

11. *Itri v. Lewis*, 422 A.2d 591, 592 (Pa. Super. 1980).
12. Counterclaim of defendants Ashton Hall and Segal at Counts 7, 8.

In Counts 13 and 14 of the counterclaim, defendants Ashton Hall and Segal asserted against Reliant the claims of breach of the covenant of good faith and fair dealing and bad faith.

> [E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.... Where a duty of good faith arises, it arises under the law of contracts, not under the law of torts.[13]

> [I]n Pennsylvania there is no general common law cause of action in tort solely for bad faith. Where a duty of good faith arises, it arises under the law of contracts, not under the law of torts.[14]

> [A] breach of the covenant of good faith is nothing more than a breach of contract claim and...separate causes of action cannot be maintained for each, even in the alternative.[15]

In this case, defendants Ashton Hall and Segal asserted breach of contract in count 1, and breach of the covenant of good faith and fair dealing and bad faith, in counts 7 and 8 of their counterclaim. The claims asserting breach of the covenant of good faith and bad faith arise under a contract involved in this case, and may not be maintained as separate causes of action, even in the alternative. There is no actionable claim for breach of good faith and fair dealing separate and apart from the obligation to comply

---

13. *Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank & Trust Co.*, 560 A.2d 151 (Pa. Super. 1989).

14. *Gorski v. Smith*, 812 A.2d 683, 710 (Pa. Super. 2002).

15. *JHE, Inc. v. SEPTA*, 2002 Phila. Ct. Com. Pl. LEXIS 78 (Pa. C.P. 2002).

with the contract "in good faith." Likewise, there are not distinct damages from "bad faith" if all contractual obligations were met. The claims of breach of the covenant of good faith and fair dealing and bad faith were properly dismissed.

### V. *Defendants Failed to State a Claim for Conversion.*

Reliant attacked the claim of conversion asserted by Ashton Hall and Segal in their counterclaim. Reliant argued that the claim of conversion should be dismissed because it was "vague, ambiguous and highly uncertain," and "fail[ed] to satisfy the specificity requirements of Pa. R.C.P. 1019(a)."[16] Under the Pennsylvania Rules of Civil Procedure,

> [T]he material facts on which a cause of action or defense is based shall be stated in a concise and summary form….[The Pennsylvania Supreme Court has] construed this rule to mean that the complaint must not only apprise the defendant of the claim being asserted, but it must also summarize the essential facts to support the claim.[17]

In this case, the counterclaim of Ashton Hall and Segal stated that "upon information and belief, [Reliant] has transferred and converted tangible and intangible assets of defendant Ashton Hall…."[18] This averment did not apprise Reliant of the claim asserted by Ashton Hall and Segal, and did allege any facts to support a claim of conversion.

---

16. Reliant's memorandum of law in support of its preliminary o - jections to the counterclaim of Ashton Hall and Segal, pp. 18-19.
17. *Steiner v. Markel,* 600 Pa. 515, 526-27, 968 A.2d 1253, 1260 (Pa. 2009) (discussing Pa. R.C.P. 1019).
18. Counterclaim of defendants Ashton Hall and Segal, ¶242.

That claim, asserted in count III of the counterclaim, was insufficiently stated and properly dismissed.

VI. *The Claim Asserting Demand for Accounting in the Counterclaim of defendants Ashton Hall and Segal was Redundant.*

Count 15 of the counterclaim of defendants Ashton Hall and Segal sought an accounting from plaintiff Reliant.

In Pennsylvania, "[t]he right to relief in the form of an accounting is merely an incident to a proper assumpsit claim....[A]ccounting is not proper... where the plaintiff possesses an adequate remedy at law."[19] In this case, defendants Ashton Hall and Segal asserted in their counterclaim the claims of breach of contract and a demand for an accounting. The claim of breach of contract provides Ashton Hall and Segal with adequate remedy at law, and the claim asserting a demand for accounting in count 15 of the counterclaim was properly dismissed because it was merely incidental to the breach-of-contract claim.

VII. *The Claims for Disgorgement of Management Fees and Revenues were Redundant.*

In counts 17 and 18 of the counterclaim, defendants sought to recover damages through the claims of disgorgement of management fees and disgorgement of revenues.

In Pennsylvania, "[t]he purpose of damages in contract actions is to return the parties to the position they would

---

19. *Buczek v. First Nat'l Bank*, 531 A.2d 1122, 1124 (Pa. Super. 1987).

have been in but for the breach."[20] In this case, defendants Ashton Hall and Segal asserted breach of contract in count 1, and demanded disgorgement of fees and revenues in counts 17 and 18 of their counterclaim. If successful on the breach of contract claim, Ashton Hall and Segal would have been returned to their original position. Ashton Hall and Segal availed themselves of a claim that could have restored them to their original position, and their demand for disgorgement of fees and revenues was redundant as an independent claim. The claims asserting disgorgement of management fees and disgorgement of revenues were properly dismissed.

For all the foregoing reasons, this court respectfully suggests that its order dated March 16, 2009 should be affirmed on appeal.

### 2. Order Dated July 6, 2009.

### MEMORANDUM OPINION

Defendants appeal the order dated July 6 2009 which required defendants for the second time to produce documents demonstrating their compliance with corporate formalities.

In January 2008, plaintiff Reliant Healthcare Management, Inc. filed a complaint against defendants Ashton Hall and Stanley Segal. The complaint alleged at paragraph 6 that defendants had failed to follow corporate formalities. In the answer to the complaint, defendants denied the allegation above. Subsequently, plaintiff served defendants with a request for production of documents

---

20. *The Birth Ctr. v. The St. Paul Cos.*, 567 Pa. 386, 400, 787 A.2d 376, 385 (Pa. 2001).

demonstrating compliance with corporate formalities.

On June 1, 2009, this court issued an order requiring defendants to produce such documents, no later than June 5, 2009. Defendant failed to produce the documents by the specified date, and plaintiff filed a "motion to compel compliance with this court's order." On July 6, 2009, this court issued an order granting Reliant's motion to compel rompliance.

In Pennsylvania,

> …:a party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action… including …any books, documents, or other intangible things….[21]

> Any Party may serve a request upon a party…to produce and permit the requesting party…to inspect and copy any designated documents….[22]

In this case, defendants did not comply with this court's order requiring them to produce documents relevant to their defense, nor did they assert any privilege in support of their failure to comply. This court's order dated July 6, 2009 merely compelled defendants to comply with this court's prior order.

For the foregoing reason, this court respectfully suggests that its order dated July 6, 2009 should be affirmed on appeal.

### 3. *Order Dated August 3, 2009.*

---

21. Pa. R.C.P. 4003.1(a).
22. Pa. R.C.P. 4009.1.

Defendants Ashton Hall, Inc. and Stanley Segal ("defendants,") appeal the order of this court dated August 3, 2009. That order entirely denied defendant's "motion to compel compliance with court's order and subpoena compelling discovery and for an extension of time."[23]

For the reasons stated in the footnote below, this court respectfully suggests that its order dated August 3, 2009 should be affirmed on appeal.

## 4. *Order Dated August 26, 2009*

### MEMORANDUM OPINION

Defendants Ashton Hall, Inc. and Stanley Segal appeal the order of this court dated August 26, 2009. That order denied defendants' "motion for leave to amend the counterclaims and for leave to file a joinder complaint."

Defendants Ashton Hall and Stanley Segal ("Ashton Hall and Segal") were parties to a management agreement entered into with plaintiff Reliant Healthcare management, Inc. ("Reliant") pursuant to the management agreement, Reliant assumed management of the Ashton Hall Nursing Home, an entity owned by defendant Segal. Under the agreement, Segal was obligated to "provide sufficient working capital for the operation of the facility and upon the request of [Reliant] from time to time as may

---

23. In the "motion to compel compliance with court's order and su - poena compelling discovery and for extension of time," defendants asserted that plaintiff's deponent, Mr. Anthony Ferrante, ended deposition on the last available day of discovery, June 5, 2009, before defendants could ask all their questions. This court denied the motion because defendants had an ample opportunity to depose Mr. Ferrante on two consecutive days, on June 4-5 2009, and did depose him on both days, for a total of four-and-one-half hours. This court was not convinced by defendants' implied argument that Mr. Ferrante had arbitrarily abandoned deposition proceedings.

be needed for the continued operation of the facility."[24]

In January 2008, Reliant was fired as manager of the nursing home. On January 16, 2008, Reliant filed suit against Ashton Hall and Segal for breach of contract and other claims. Ashton Hall and Segal counterclaimed on August 15, 2008. Upon preliminary objections to the counterclaim, this court dismissed all but five claims asserted by Ashton Hall and Segal in their twenty-five count counterclaim.

In July 31, 2009, defendants Ashton Hall and Stanley Segal filed a motion to amend their counterclaim and for leave of court to file joinder complaint. This motion was filed well beyond the time allowed by the Pennsylvania Rules of Civil Procedure, which require a joinder complaint to be filed no later than sixty (60) days from service to defendants of plaintiff's original pleading.[25]

In the motion to amend their counterclaim, Ashton Hall and Segal sought "to recover cash calls" in the amount of $1.4 million, which Segal had made to the Ashton Hall Nursing Home upon allegedly improper requests made by Reliant during its tenure as manager of the nursing home.

In Pennsylvania, "[t]he purpose of damages in contract actions is to return the parties to the position they would have been in but for the breach."[26] In this case, defendants Ashton Hall and Segal asserted the claim of breach of

---

24. Management agreement, Article 1.08.

25. Pa. R.C.P. 2253(a) states: "neither a praecipe for a writ to join additional defendant nor a complaint if the joinder is commenced by complaint, shall be filed later than (1) sixty days after the service upon the original defendant of the initial pleading."

26. *The Birth Ctr. v. The St. Paul Cos.*, 567 Pa. 386, 400, 787 A.2d 376, 385 (Pa. 2001).

contract in count 1 of their counterclaim. If successful on the breach of contract claim, Ashton Hall and Segal would have been returned to their original position, and Segal would have recovered all cash calls improperly made by Reliant. The motion of Ashton Hall and Segal to amend their counterclaim to recover cash calls in the amount for $1.4 million was redundant and unnecessary, and this court properly denied the motion in its order dated August 26, 2009.

In their motion for leave to file a joinder complaint, Ashton Hall and Segal sought to join a number of entities and individuals affiliated with Reliant. The untimely filed motion offered no reasons as to why those entities and individuals should be joined, nor did it indicate where such reasons, if any, could be found in the record.

"[T]he burden of demonstrating sufficient cause to allow late joinder of an additional defendant rests with the defendant, who must establish some reasonable justification for its delay."[27] In this case defendants' motion for leave of court to file a joinder complaint was untimely filed and offered no reason as to why certain entities and individuals should be joined. The motion was properly denied.

For the foregoing reasons, this court respectfully suggests that its order dated August 26, 2009 should be affirmed on appeal.

### 5. *Order Dated December 18, 2009.*

### MEMORANDUM OPINION

---

27. *Exton Dev. v. Sun Oil Co.*, 525 A.2d 402, 403 (Pa. Super. 1987).

Defendants Ashton Hall, Inc. and Stanley Segal appeal this court's order dated December 18, 2009. That order substantially granted summary judgment in favor of plaintiff, Reliant Healthcare Management, Inc.

## Background

Plaintiff, Reliant Healthcare Management, Inc. ("Reliant") is a manager of nursing homes. Defendant, Ashton Hall, Inc. ("Ashton Hall") was the owner of a nursing home formerly managed by Reliant. Individual defendant, Stanley Segal, was the president in control of Ashton Hall. Former defendant 50 Jersey LLC ("50 Jersey"), a New Jersey company, is the current manager of Ashton Hall, and was successor in interest of Oakhurst Properties. LLC ("Oakhurst") an entity which acquired Ashton Hall from Segal. Former individual defendants Newt Weinberger ("Weinberger") and Eliezer Friedman ("Friedman") are the sole members of 50 Jersey.

Early in 2007, the Ashton Hall nursing home was experiencing significant administration problems under Segal's management, and had failed to comply with regulations promulgated by the Pennsylvania Department of Health. In March 2007, these problems reached their zenith when the U.S. Department of Justice asked Segal to change management of the nursing home.[28]

On April 16, 2007, Ashton Hall and Reliant entered into a "management agreement" whereby Reliant assumed immediate management of the nursing home for a period of four years.[29] Reliant assumed this duty to enable the

---

28. Deposition of defendant Segal, Exhibit A to Reliant's motion for summary judgment, pp. 11-13.
29. Management Agreement, Exhibit A to Reliant's motion for su -

nursing home to achieve regulatory compliance. Under the management agreement, any party could terminate the contract at any time, without notice, if occupancy of the nursing home fell below 85 percent for a period of 180 days.[30] This occupancy requirement became effective July 3, 2007, the day in which the nursing home received permission to admit new patients.[31] The management agreement also provided that any party could terminate the agreement if the other party failed to observe a material term of the agreement. Termination for failure to observe any material terms required the non-breaching party to give written notice of termination, and afford the breaching party five days to cure the breach.[32] The agreement also required Ashton Hall to provide the working capital for the operation of the nursing home.[33]

After Reliant assumed management of the nursing home, Segal realized that he lacked the money to fund its operations.[34] To satisfy his obligations, Segal tapped a trust fund established for the benefit of his children.[35] Despite the injection of cash from the trust fund, Segal continued to lack capital and was faced with the prospect of losing the property and nursing home to creditors.

---

mary judgment at Article I.

30. Management Agreement, Exhibits F to Reliant's motion for summary judgment at Articles 4.01.3(v).

31. Admission of defendant Segal, Exhibit A to Reliant's motion for summary judgment at 50-52.

32. Management agreement, Exhibit A to Reliant's motion for su - mary judgment at Article 4.01.2.

33. Management agreement, Exhibit A to Reliant's motion for su - mary judgment at Article 1.08.

34. Deposition of defendant. Segal, Exhibit A to Reliant's motion for summary judgment, p.389.

35. Deposition of defendant Segal, Exhibit A to Reliant's motion for summary judgment, p.336.

Reliant offered to buy the Ashton Hall property and nursing home from Segal, and drafted a purchase agreement.[36] On August 16, 2007, Segal rejected the offer and refused to sign the agreement drafted by Reliant.[37] In his rejection letter, Segal advised Reliant that he had hired a different manager for the nursing home, and forbade Reliant from drafting any checks on behalf of Ashton Hall.[38] On August 22, 2007, Reliant replied to Segal's letter, asserted its intention to continue as manager pursuant to the management agreement, and sent copies of its reply to the Pennsylvania Department of Health, and the U.S. Offices of the Attorney General and the Department of Health and Human Services.[39]

To extricate Ashton Hall and himself from the funding obligation, Segal sought to sell the property and business to another party. In December 2007, Segal negotiated with Oakhurst Properties ("Oakhurst"), a New Jersey entity associated with former individual defendants Weinberger and Friedman. Oakhurst agreed to buy the Ashton Hall property and nursing home if its affiliate, 50 Jersey, assumed management by the closing date.[40] On December 28, 2007, Segal agreed to Oakhurst's offer, and the parties scheduled a closing date.[41] Until closing, Ashton Hall

36. Exhibit D to defendants answer in opposition to Reliant's motion for summary judgment.

37. Letter from Segal to Reliant, Exhibit F to Defendants' answer in opposition to Reliant's motion for summary judgment.

38. Letter from Segal to Reliant, Exhibit F to defendants' answer in opposition to Reliant's motion for summary judgment.

39. Letter from Reliant to Segal, Exhibit G to defendants' answer in opposition to Reliant's motion for summary judgment.

40. Deposition of defendant Segal, Exhibit A to Reliant's motion for summary judgment, pp. 387-390.

41. Asset Purchase Agreement, Exhibits G and H to Reliant's motion for summary judgment.

continued to be bound to its obligation fund the nursing home.[42]

On January 10, 2008, as the closing date approached, 50 Jersey asked its attorney, Bruce G. Baron ("Baron"), whether the management agreement between Reliant and Ashton Hall could be terminated.[43] Baron asked Segal whether any grounds for termination existed. On January 11, 2008, Segal replied by forwarding a list of 10 purported breaches by Reliant.[44] Items 1 and 4 of the list stated that Reliant had breached the management agreement by allowing occupancy at the nursing home to fall below 85 percent for 180 days, and failing to make mortgage payments.[45] Baron drafted a termination letter based on these alleged breaches and sent it to Segal on January 16, 2008. Segal forwarded that letter to Reliant. In the letter, Segal informed Reliant that Ashton Hall was terminating the management agreement. The letter stated that Reliant had allowed occupancy to fall below 85 percent for 180 days, and had failed to make mortgage payments.[46] The letter was copied to the Pennsylvania Department of Health, the Office of the U.S. Attorney, and the U.S. Health and Human Services Office of the Inspector General.

On January 25, 2008, Reliant filed a complaint against

---

42. Deposition of defendant Segal, Exhibit A to Reliant's motion for summary judgment, p.387.

43. Deposition of George C. Baron, Exhibit D to Reliant's motion for summary judgment, p.75.

44. Deposition of George C. Baron, Exhibit D to Reliant's motion for summary judgment, p.75.

45. Letter from Segal to Baron, January 11, 2008, Exhibit L to Reliant's motion for summary judgment.

46. Termination letter, Exhibit K to Reliant's motion for summary judgment.

Ashton Hall, Segal, 50 Jersey, Weinberger and Friedman. The complaint asserted the claims of breach of contract and fraud against defendants Ashton Hall and Segal; tortious interference with current and prospective contractual relations against defendants 50 Jersey, Weinberger, Friedman and Segal; and defamation and conspiracy against all defendants. On May 1, 2008, defendants Segal and Ashton filed preliminary objections to Reliant's complaint. Preliminary objections were sustained in part and overruled in part. The claim of tortious interference asserted by Reliant against defendants was dismissed.[47] On August 15, 2008, defendants Ashton Hall and Segal filed a counterclaim to Reliant's complaint. On March 17, 2009 defendants 50 Jersey, Weinberger and Friedman filed a praecipe to discontinue their counterclaim against Reliant, and on April 6, 2009, Reliant filed a stipulation to settle, discontinue and end all claims asserted against defendants 50 Jersey, Weinberger and Friedman. Discovery has closed and the cross motions for summary judgment are presented.

## Discussion

Under the Pennsylvania Rules of Civil Procedure, "the court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. Under the rules, a motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. For purposes of summary judgment, the record includes any

47. Docket No. 0801-3083, control No. 08042472, order entered July 18, 2008.

pleadings, interrogatory answers, depositions, admissions, and affidavits."[48] Summary judgment is properly granted when "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action."[49]

## I. Occupancy at the Nursing Home did not Fall Below 85 Percent for a Period of 180 Days.

Segal terminated the management agreement with Reliant because "occupancy of the Nursing Home has dropped below 85 percent for a period of 180 days."[50] In its motion for summary judgment, Reliant asserts that occupancy at the nursing home did not fall below 85 percent for a period of 180 days, and provides a census worksheet to support its position. The occupancy provision in the management agreement states:

Article IV Termination 4.01 Termination for Cause.

* * *

Owner or Manager shall have the right to terminate this agreement at any time if... (v) the occupancy of the Nursing home has dropped below eighty-five percent (85 percent) for a period of 180 days.[51]

The census worksheet for Ashton Hall shows that the nursing home was licensed for 148 beds.[52] To reach an

---

48. *Scalice v. Pa. Emples. Benefit Trust Fund,* 584 Pa. 161, 171, 883 A.2d 429, 435 (Pa. 2005) (citing Pa. R.C.P. 1035.2(1), 1035.2).

49. *Young v. DOT,* 560 Pa. 373, 375-376, 744 A.2d 1276, 1277 (Pa. 2000) (explaining Pa. R.C.P. 1035.2(2).

50. Termination Letter, Exhibit K to Reliant's motion for summary judgment.

51. Management agreement, Exhibit F to Reliant's motion for summary judgment, Article 4.01.3.

52. Census Worksheet, Exhibit M to Reliant's motion for summary

occupancy level of 85 percent , Reliant was required to billet at least 126 beds. The census worksheet shows that Reliant billeted 126 beds for the first time on October 13, 2007. Five days later, October 18, 2007, occupancy fell below 126 billeted beds.[53] Only 102 days elapsed between July 3, 2007, the day in which the occupancy requirement was triggered, and October 13, 2007, the day in which Ashton Hall achieved 85 percent occupancy. Only 88 days elapsed between October 18, 2007, the day in which occupancy dropped below 85 percent again, and January 16, 2008, the day in which Segal terminated the management agreement. Defendant Segal admits that the census worksheet is the only record "in the world" to establish census at Ashton Hall, and such a record shows that occupancy of the nursing home did not fall below 85 percent for a period of 180 days.[54] Termination on the basis of insufficient occupancy was improper.

II. *Ashton Hall Breached the Management Agreement by Failing to Provide Plaintiff with 30 Days Written Notice.*

Segal's termination letter states that "the agreement is terminated because Reliant has failed to make required payments on the owner's first mortgage loan financing, for which termination is authorized by Section 4.01(4) of the management agreement."[55] In the motion for summary judgment, Reliant asserts that termination was in breach of

judgment.
 53. Census Worksheet, Exhibit M to Reliant's motion for summary judgment.
 54. Deposition of defendant Segal, Exhibit A to Reliant's motion for summary judgment, pp. 87-89.
 55. Termination letter, Exhibit K to Reliant's motion for summary judgment.

the management agreement because Segal and Ashton Hall failed to provide written 30 days notice as required under the contract. The pertinent sections of the management agreement state:

> Owner shall have the right to terminate this agreement on thirty (30) days notice if an event of default on owner's first mortgage loan financing has theretofore occurred and is then continuing and such event of default is due to the actions of Manager.
>
> * * *
>
> Notices. All notices, demands and requests contemplated hereunder by either party to the other shall be in writing, and shall be delivered by hand, postage prepaid, registered, or certified mail return receipt requested.[56]

The language in these provisions is clear and unambiguous: if manager fails to pay owner's mortgage, owner may begin termination proceedings only by providing manager with thirty (30) days written notice. If the default persists more than 30 days after manager receives that notice, owner may properly terminate the management agreement if the default is caused by the actions of manager. In this case, Reliant did not receive a 30 days written notice before termination. Termination was improper and in breach of the management agreement.

III. *The Termination Letter was not Defamatory.*

The termination letter, copied to various U.S. and Pennsylvania governmental regulatory entities, explained

---

56. Management Agreement, Sections 4.01(4), 5.09.

the bases for the decision of defendants Segal and Ashton Hall to terminate the management agreement. Reliant argues that disclosing the bases for terminating the agreement was improper, unjustifiable and unnecessary. Reliant contends that disclosing the bases for termination to governmental regulatory entities exposed Reliant to potential sanctions and loss of license.[57]

"A publication is defamatory if it tends to harass the reputation of another so as to lower him or her in the estimation of the community or if it tends to deter third persons from associating or dealing with him or her."[58] It is a matter for the court to determine in the first instance whether the language of the alleged defamatory statement "can fairly and reasonably be construed to have the libelous meaning ascribed to it by... plaintiff."[59] An innuendo ... can never add nor change the alleged meaning of the defamatory statement, or operate as an averment, imparting into the statement anything which is not a usual and natural presumption from the precedent words.... It is the duty of the court in all cases to determine whether the [words] used in the objectionable [language] could fairly and reasonably be construed to have the meaning imputed in the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury."[60]

---

57. Motion for summary judgment of plaintiff Reliant, p.24.

58. *Sobel v. Wingard*, 531 A.2d 520, 522 (Pa. Super. 1987) (citing *Corabi v. Curtis Publishing Co.*, 273 A.2d 899 (Pa. 1971)).

59. *Bogash v. Elkins*, 405 Pa. 437, 439, 176 A.2d 677, 678 (Pa. 1962).

60. *McAndrews v. Scranton Republican Publishing Company*, 364 Pa. 504, 511-512, 72 A.2d 780, 783 (Pa. 1950).

In this case, the termination letter copied to the governmental entities did not criticize Reliant's ability to manage the nursing home, but merely incorrectly stated the bases for the termination. Reliant asserts that the "only possible explanation" for this disclosure "was to injure Reliant and to prevent it from operating other nursing homes in the future."[61] There is no evidence presented as to how the words in the termination letter would be received by governmental regulatory authorities, what repercussions they might trigger, or whether such words would prevent Reliant from operating other nursing homes. The language in the termination letter was not defamatory and Reliant's motion for summary judgment is denied as to the claim of defamation.

## IV. *Reliant has Failed to Prove Conspiracy.*

Reliant's motion for summary judgment asks the court to rule that Ashton Hall, Segal and 50 Jersey conspired to tortiously remove Reliant as manager of the nursing home.[62]

To prove a claim of civil conspiracy, plaintiff must show "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means."[63] In this case, plaintiff offers the deposition testimony of Bruce Baron to show that Ashton Hall, Segal and 50 Jersey conspired to remove Reliant as manager of the nursing home. Bruce Baron testified:

---

61. Motion for summary judgment of plaintiff Reliant, p.24.
62. Memorandum of law in support of Reliant's motion for summary judgment, pp. 22-24.
63. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (Pa. 1979).

Question: Did Mr. Segal ever tell you that he needed to terminate Reliant's management agreement so that he could get 50 Jersey into the facility?

Baron: *He* linked the two. *He* never made that statement.

Question: When you say "he linked the two," meaning what, that --

Baron: For the reasons I've stated earlier, that *he* was interested in getting Reliant out as quickly as possible because *he* felt that if they [Reliant] continued to stay, the facility would be financially ruined and *he* wouldn't get to closing, and *he* wanted to owners to get in with their management company because he wouldn't have that problem.[64]

This testimony does not demonstrate that 50 Jersey either "combined or agreed" with Ashton Hall and Segal to tortiously remove Reliant as manager of the nursing home. Reliant has failed to offer any evidence showing that 50 Jersey entered into a combination or agreement with Ashton Hall and Segal.

V. *Segal May not be Held Personally Liable.*

Defendants Ashton Hall and Segal argue in their motion for summary judgment that Reliant may not pierce the corporate veil and may not hold Segal personally liable.[65] Opposing the argument, Reliant asserts that Segal pierced the corporate veil because he commingled his

---

64. Deposition of Bruce Baron, Exhibit D to Reliant's motion for summary judgment, pp. 134-135 (emphasis supplied).
65. Brief in support of the motion for summary judgment of defendants Ashton Hall and Segal at Section J.

funds with those of Ashton Hall. Reliant contends that Segal commingled the funds when he used money from his children's trust fund to finance the operations of the nursing home.[66]

"[T]here is a strong presumption in Pennsylvania against piercing the corporate veil.... The factors to be considered in disregarding the corporate form are undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud."[67] In this case, Reliant asserts that Segal commingled his children's affairs with those of Ashton Hall. Reliant does not assert that Segal commingled his own affairs with those of Ashton hall, other than provide funding to the nursing home. Segal may not be held personally liable to Reliant regardless of any violation of his fiduciary duties to his children.

For the reasons above, this court respectfully suggests that its order dated December 18, 2009 should be affirmed on appeal.

### 6. *Order Dated April 21, 2010.*

### MEMORANDUM OPINION

Defendants Ashton Hall, Inc. and Stanley Segal appeal this court's order dated April 21, 2010. That order granted the motion for summary judgment filed by plaintiff, Reliant Healthcare Management, Inc. against the counterclaims of defendants.

---

66. Memorandum of law in opposition to the motion for summary judgment of defendants Ashton Hall and Segal, pp. 23-24.

67. *Lumax Indus. V. Aultman,* 543 Pa. 38, 42, 669 A.2d 893, 895 (Pa. 1995).

*Background*

Plaintiff, Reliant Healthcare Management, Inc. ("Reliant"), is a manager of nursing homes. Defendant, Ashton Hall, Inc. ("Ashton Hall"), was the owner of a nursing home formerly managed by Reliant. Individual defendant, Stanley Segal, was the president in control of Ashton Hall. Former defendant 50 Jersey LLC ("50 Jersey"), a New Jersey company, is the current manager of Ashton Hall, and was successor in interest of Oakhurst Properties, LLC ("Oakhurst"), an entity which acquired Ashton Hall from Segal. Former individual defendants Newt Weinberger ("Weinberger"), and Eliezer Friedman ("Friedman"), are the sole members of 50 Jersey.

Early in 2007, the Ashton Hall nursing home was experiencing significant administration problems under Segal's management, and had failed to comply with regulations promulgated by the Pennsylvania Department of Health. In March 2007, these problems reached their zenith when the U.S. Department of Justice asked Segal to change management of the nursing home.[68]

On April 16, 2007, Ashton Hall and Reliant entered into a "management agreement" whereby Reliant assumed immediate management of the nursing home for a period of four years.[69] Reliant assumed this duty to enable the nursing home to achieve regulatory compliance. Under the management agreement, any party could terminate the contract at any time, without notice, if occupancy of the nursing home fell below 85 percent for a period of

---

68. Deposition of defendant Segal, Exhibit A to Reliant's motion for summary judgment, pp. 11-13.

69. Management Agreement, Exhibit A to Reliant's motion for su - mary judgment at Article I.

180 days.[70] The occupancy requirement became effective July 3, 2007, the day in which the nursing home received permission to admit new patients.[71] The management agreement also provided that any party could terminate the agreement if the other party failed to observe a material term of the agreement. Termination for failure to observe any material terms required the non-breaching party to give written notice of termination, and afford the breaching party five days to cure the breach.[72] The agreement also required Ashton Hall to provide the working capital for the operation of the nursing home.[73] Finally, the agreement contained an integration clause which stated:

> 5.06 Entire agreement: Amendments. This agreement contains the entire agreement between the parties hereto, and no prior oral or written, and no contemporaneous oral, representations or agreements between the parties with respect to the subject matter in this agreement shall be of any force or effect.[74]

After Reliant assumed its management duties, Segal realized that he lacked the money to fund the nursing home on behalf of Ashton Hall.[75] To satisfy Ashton Hall's funding obligations, Segal tapped a trust fund established

---

70. Management Agreement, Exhibits F to Reliant's motion for summary judgment at Articles 4.01.3(v).

71. Admission of defendant Segal, Exhibit A to Reliant's motion for summary judgment at 50-52.

72. Management Agreement, Exhibit A to Reliant's motion for su - mary judgment at Article 4.01.2.

73. Management Agreement, Exhibit A to Reliant's motion for su - mary judgment at Article 1.08.

74. Management Agreement, Exhibit A to Reliant's motion for su - mary judgment at Article 5.06.

75. Deposition of Defendant. Segal, Exhibit A to Reliant's motion for summary judgment, p. 389.

for the benefit of his children.[76] But despite the injection of cash from the trust fund, Ashton Hall continued to lack capital and Segal was faced with the prospect of losing the property and nursing home to creditors.

Reliant offered to buy the Ashton Hall property and nursing home from Segal, and drafted a purchase agreement.[77] On August 16, 2007, Segal rejected the offer.[78] In the rejection letter, Segal advised Reliant that he had hired a different manager for the nursing home, and forbade Reliant from drafting any checks on behalf of Ashton Hall.[79] On August 22, 2007, Reliant replied to Segal's letter, asserted its intention to continue as manager pursuant to the management agreement, and sent copies of its reply to the Pennsylvania Department of Health, and the U.S. Offices of the Attorney General and the Department of Health and Human Services.[80]

To extricate Ashton Hall and himself from the funding obligation, Segal sought to sell the property and business to another party. In December 2007, Segal negotiated with Oakhurst, a New Jersey entity associated with former individual defendants Weinberger and Friedman. Oakhurst agreed to buy the Ashton Hall property and the nursing home, if its affiliate, 50 Jersey, replaced Reliant as manager of the nursing home, no later than the closing date.[81] On

---

76. Deposition of defendant Segal, Exhibit A to Reliant's motion for summary judgment, p. 336.

77. Exhibit D to defendants answer in opposition to Reliant's motion for summary judgment.

78. Letter from Segal to Reliant, Exhibit F to defendants' answer in opposition to Reliant's motion for summary judgment.

79. Letter from Segal to Reliant, Exhibit F to defendants' answer in opposition to Reliant's motion for summary judgment.

80. Letter from Reliant to Segal, Exhibit G to defendants' answer in opposition to Reliant's motion for summary judgment.

81. Deposition of defendant Segal, Exhibit A to Reliant's motion for

December 28, 2007, Segal agreed to Oakhurst's offer, and the parties scheduled a closing date.[82] Until closing, Ashton Hall continued to be bound to its obligation fund the nursing home.[83]

On January 10, 2008, as the closing date approached, 50 Jersey asked its attorney, Bruce G. Baron ("Baron"), whether the management agreement between Reliant and Ashton Hall could be terminated.[84] Baron inquired with Segal whether any grounds existed to terminate Reliant. On January 11, 2008, Segal replied by forwarding a list often purported breaches by Reliant.[85] Items 1 and 4 of the list stated that Reliant had breached the management agreement by allowing occupancy at the nursing home to fall below 85 percent for 180 days, and failing to make mortgage payments.[86] Baron drafted a termination letter based on these alleged breaches and sent it to Segal on January 16, 2008. Segal forwarded that letter to Reliant. The termination letter stated:

> The basis for the Termination is provided in Section 4.01(3)(v) in that the occupancy of the nursing Home has dropped below 85 percent for a period of 180 days. In addition, to the extent there is any dispute concerning the foregoing basis for termination, Notice is also given that the agreement is terminated because Reliant

summary judgment, pp. 387-390.

82. Asset Purchase Agreement, Exhibits G and H to Reliant's motion for summary judgment.

83. Deposition of defendant Segal, Exhibit A to Reliant's motion for summary judgment, p.387.

84. Deposition of George C. Baron, Exhibit D to Reliant's motion for summary judgment, p.75.

85. Deposition of George C. Baron, Exhibit D to Reliant's motion for summary judgment, p.75.

86. Letter from Segal to Baron, January 11, 2008, Exhibit L to Reliant's motion for summary judgment.

has failed to make required payments on the Owner's first mortgage loan financing, for which termination is authorized by Section 4.01(4); and, Reliant did not provide notice of such failure to the owner.[87]

On January 25, 2008, Reliant filed a complaint against Ashton Hall, Segal, 50 Jersey, Weinberger and Friedman. The complaint asserted the claims of breach of contract and fraud against defendants Ashton Hall and Segal; tortious interference with current and prospective contractual relations against defendants 50 Jersey, Weinberger, Friedman and Segal; and defamation and conspiracy against all defendants. On May 1, 2008, defendants Segal and Ashton filed preliminary objections to Reliant's complaint. Preliminary objections were sustained in part and overruled in part. The claim of tortious interference asserted by Reliant against defendants was dismissed.[88] On August 15, 2008, defendants Ashton Hall and Segal filed a counterclaim asserting 25 counts against Reliant. Reliant filed preliminary objections to the counterclaim, and this court sustained in part and overruled in part those preliminary objections. Only the counterclaims of breach of contract, breach of fiduciary duty, intentional and negligent misrepresentation, and contribution and indemnification, survived the preliminary objections.[89] On March 17, 2009 defendants 50 Jersey, Weinberger and Friedman filed a praecipe to discontinue their counterclaim against Reliant, and on April 6, 2009, Reliant filed a stipulation to settle, discontinue and end all claims asserted against defendants

87. Termination letter, Exhibit K to Reliant's motion for summary judgment.
88. Docket No. 0801-3083, control no. 08042472, order entered July 18, 2008.
89. Order dated March 17, 2009.

50 Jersey, Weinberger and Friedman.

Plaintiff Reliant moved for summary judgment on its claims and the counterclaims of defendants Ashton Hall and Segal. Ashton Hall and Segal cross-moved for summary judgment on their counterclaims. This court issued an order and opinion on December 21, 2009 denying defendants' motion for summary judgment on their counterclaims. The court also granted in part and denied in part plaintiff's motion for summary judgment on its claims. The order granted summary judgment in favor of plaintiff as to the breach-of-contract claim, and denied the motion as to the claims of conspiracy and defamation. The order also denied plaintiff's motion as to all claims asserted against individual defendant Segal. The order did not address plaintiff's motion for summary judgment on the counterclaims of Ashton Hall and Segal, and the court now addresses that portion of the motion.

## Discussion

Under the Pennsylvania Rules of Civil Procedure, "the court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. Under the rules, a motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. For purposes of summary judgment, the record includes any pleadings, interrogatory answers, depositions, admissions, and affidavits."[90] Summary judgment is properly granted when "an adverse party who will bear the burden of proof

---

90. *Scalice v. Pa. Emples. Benefit Trust Fund,* 584 Pa. 161, 171 883 A.2d 429, 435 (Pa. 2005) (citing Pa. R.C.P. 1035.2(1), 1035.2).

at trial has failed to produce evidence of facts essential to the cause of action."[91]

## VI. *Defendants' Breach-of-Contract Claim Fails as a Matter of Law.*

In the order-and-opinion of December 21, 2009, this court held that defendants Ashton Hall and Segal had breached the management agreement by failing to provide Reliant with 30-day written notice before termination.[92] Attacking defendants' breach-of-contract claim, Reliant argues that the claim fails as a matter of law because defendants materially breached management agreement and effectively discharged Reliant from any subsequent contractual duty or liability.[93]

> [A] material breach by one party to a contract entitles the non-breaching party to suspend performance.... If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract.... In determining materiality for purposes of breaching a contract, we consider the following factors:
>
> a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

91. *Young v. DOT*, 560 Pa. 373, 375-376, 744 A.2d 1276, 1277 (Pa. 2000) (explaining Pa. R.C.P. 1035.2(2)).
92. Order and opinion dated December 21, 2009.
93. Memorandum of law of plaintiff Reliant in support of its motion for summary judgment, p. 26.

c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.[94]

In this case, un-rebutted evidence shows that defendants improperly terminated the management agreement. The improper termination deprived Reliant of its expected benefits as manager of the nursing home, and constituted a material breach of the management agreement. Defendants materially breached the management agreement and discharged Reliant of any duty or liability arising thereunder. The claim of breach of contract asserted by defendants Ashton Hall and Segal in their counterclaim fails as a matter of law.

VII. *Defendants May not Maintain the Claim of Contribution and Indemnification.*

Count XVI of defendants' counterclaim asserts the claim of contribution and indemnification against Reliant. Defendants aver that the management agreement requires Reliant to indemnify and hold defendants harmless for breaches of the management agreement allegedly committed by Reliant.[95] Reliant moves for

---

94. *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 467-468 (Pa. Super. 2003).

95. Counterclaim of Ashton Hall and Segal, Count XVI, pp. 93-94.

summary judgment against this claim. Reliant argues that defendants materially breached the management agreement and discharged Reliant from any obligation hereunder.[96] In this case, un-rebutted evidence shows that defendants materially breached the management agreement by improperly terminating Reliant as manager of the nursing home. This material breach discharged Reliant from any duty or liability under the management agreement, and defendants may not maintain the claim of contribution and indemnification asserted in Count XVI of the counterclaim.

VIII. *Defendants May not Maintain the Breach-of-Fiduciary-Duty Claim.*

Count II of defendants' counterclaim asserts against Reliant the claim of breach of fiduciary duty. Defendants aver the existence of an agency relationship between Reliant, manager of the nursing home, and Ashton Hall, owner of the nursing home.[97] Defendants argue that Reliant breached its fiduciary duty by excluding defendants from management of the nursing home, failing to collect monies owed to the nursing home, and causing defendants to incur increased and unnecessary expenses.[98] Moving for summary judgment against this claim, Reliant argues that no fiduciary duty could exist in a business relationship controlled by an arms length contract. Reliant asserts that the management agreement was an arms length contract, and concludes that no fiduciary relationship arose

---

96. Memorandum of law in support of Reliant's motion for summary judgment, p. 31.

97. Answer of defendants Ashton Hall and Segal to the motion for summary judgment of plaintiff Reliant, pp. 26-27.

98. Counterclaim of defendants Ashton Hall and Segal, ¶¶ 232-238.

therefrom.[99]

A special relationship is one involving confidentiality, the repose of special trust or fiduciary responsibilities.... [T]he critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side."[100] "There is a crucial distinction between surrendering control of one's affairs to a fiduciary confidant or party in a position to exercise undue influence and entering an arms length commercial agreement...."[101] There is "no special relationship between parties to arms length business contract."[102]

In this case, defendants Ashton Hall and Segal wished to bring the nursing home under regulatory compliance, and freely entered into a management agreement with Reliant to achieve that goal. Defendant Segal even admits that he was involved in drafting the management agreement.[103] Reliant did not exercise overmastering influence over defendants, and owed them no fiduciary duty because their business relationship was founded upon an arms length contract. The motion for summary judgment of plaintiff Reliant is granted as to the claim of breach of fiduciary duty asserted by defendants Ashton Hall and Segal in

99. Memorandum of law in support of Reliant's motion for summary judgment, pp. 27-28.

100. *E-Toll, Inc. v. Elias / Savion Advertising, Inc.*, 811 A.2d 10, 23 (Pa. Super. 2002).

101. *E-Toll, Inc. v. Elias / Savion Advertising, Inc.*, 811 A.2d at 23 (Pa. Super. 2002).

102. *E-Toll, Inc. v. Elias / Savion Advertising, Inc.*, 811 A.2d at 23 (Pa. Super. 2002) (citing *Elliot v. Clawson*, 204 A.2d 272, 273 (Pa. 1964)).

103. Deposition of defendant Segal, Exhibit A to Reliant's motion for summary judgment, pp. 45-46, 57-58.

Count II of the counterclaim.

IV. *Defendants May not Maintain the Claims of Intentional and Negligent Misrepresentation.*

Counts V and VI of defendants' counterclaim assert the claims of intentional and negligent misrepresentation respectively.[104] According to defendants, Reliant "made false and fraudulent misrepresentations with the intent to mislead defendant Ashton Hall to induce defendant Ashton Hall to enter into the agreement."[105] Reliant moves for summary judgment against these claims. Reliant argues that both claims fail as a matter of law because the parol evidence rule bars any evidence of fraud to contradict the terms contained in the fully integrated management agreement.

In Pennsylvania, "while parol evidence may be introduced based on a party's claim that there was fraud in the execution of a contract, i.e., that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, i.e., that an opposing party made false representations that induced the complaining party to agree to the contract."[106]

In this case, defendants allege that Reliant intentionally or negligently made fraudulent misrepresentations intended to induce Ashton Hall to enter into the

---

104. Counterclaim of defendants Ashton Hall and Segal, ¶¶ 258, 263.

105. Counterclaim of Ashton Hall and Stanley Segal, ¶¶ 259, 268.

106. *Toy v. Metro. Life Ins. Co.*, 593 Pa. 20, 49-50, 928 A.2d 186, 204-205 (Pa. 2007) (citing *HCB Contractors v. Liberty Place Hotel Associates*, 652 A.2d 1278, 1279 (Pa. 1995).

management agreement.[107] Defendants may not introduce evidence aiming to show fraudulent inducement because the management agreement was a fully integrated contract. The parol evidence rule precludes introduction of such evidence any time the parties are bound by a fully integrated contract, and summary judgment is granted in favor of Reliant on the claims of intentional and negligent misrepresentation, as asserted by defendants Ashton Hall and Segal in counts V and VI of their counterclaim.

For the foregoing reasons, this court respectfully suggests that its order dated April 21, 2010 should be affirmed.

### 7. Order Dated June 14, 2010.

### MEMORANDUM OPINION

Defendants Ashton Hall, Inc. and Stanley Segal appeal the court's order dated June 14, 2010, which denied defendants' motion for reconsideration of this court's order dated April 21, 2010.

"Motions for reconsideration are discouraged unless the facts or law not previously brought to the attention of the court are raised."[108] In this case, defendants' motion for reconsideration advanced no new facts or law, and this court denied the motion.

For the foregoing reason, this court respectfully submits that its order dated June 14, 2010, denying defendants' motion for reconsideration of the order dated April 21, 2010, should be affirmed on appeal.

---

107. Counterclaim of Ashton Hall and Stanley Segal, ¶¶ 259, 68.
108. *Pa. Chiropractic Ass'n v. Independence Blue Cross*, 2001 Phila. Ct. Com. Pl. LEXIS 111 (Pa. C.P. 2001).

**8.** *Verdict of July 27, 2010.*

## MEMORANDUM OPINION

On July 27, 2010, the jury in this case returned a verdict in favor of plaintiff, Reliant Healthcare Management, Inc. and against defendants, Ashton Hall, Inc. and Stanley Segal. On July 30, 2010, defendants filed a motion for post-trial relief. The motion for post-trial relief sought entry of JNOV, a new trial, or a reduction in the award assessed against defendants. According to the motion, the jury rendered a verdict against the evidence presented at trial, and plaintiff did not prove actual damages. The motion concluded that this court erred by denying defendants' motion for a directed verdict.

> In reviewing a motion for judgment n.o.v., the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor.... Moreover, [a] judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner.[109]

This court reviewed defendants' motion and determined that all arguments therein lacked merit. The arguments advanced by defendants had no merit because both sides had an ample opportunity to prove their cases at trial, and the verdict rendered by the jury at the close of trial was consistent with the evidence presented.

This court respectfully suggests that the verdict rendered

---

109. *Moure v. Raeuchle*, 529 Pa. 394, 402, 604 A.2d 1003, 1007 (Pa. 1992).

on July 27, 2010 should be affirmed on appeal.

### 9. *Order Dated September 11, 2010.*

### MEMORANDUM OPINION

Defendants Ashton Hall, Inc. and Stanley Segal appeal the order of this court dated September 11, 2010. That order granted plaintiff Reliant Healthcare Management, Inc.'s post-trial motion to modify the jury verdict and include award of attorney's fees.

Plaintiff Reliant Healthcare Management, Inc. ("Reliant") and defendants Ashton Hall, Inc. and Stanley Segal ("Ashton Hall and Segal") were parties to a management agreement. Under the agreement, Reliant agreed to manage the Ashton Hall Nursing Home, a business owned by Ashton Hall and Segal. Paragraph 5.09 of the management agreement states that Ashton Hall and Reliant

> shall indemnify and hold harmless each other…against any and all claims losses, liabilities, deficiencies, costs and other expenses (including without limitation, reasonable attorneys' fees), including all legal actions, suits, claims, proceedings … demands…judgments… and other expenses that arise out of…either party's wrongful misconduct…. related to the services identified in this agreement.[110]

On January 16, 2008, Ashton Hall and Segal terminated Reliant as manager of the Ashton Hall Nursing Home, and Reliant filed suit against them. After trial, the jury rendered a verdict in favor of Reliant, and awarded Reliant

---

110. Management agreement, ¶5.09.

compensatory damages.

Reliant filed a post-trial motion to modify the jury verdict and include award of attorneys' fees. Since the pertinent provision of the management agreement allows an award of reasonable attorneys' fees, this court granted the motion and properly awarded Reliant with attorneys' fees, in the amount of $537,695.81.

Fore the foregoing reason, this court respectfully suggests that its order entered September 11, 2010 should be affirmed on appeal.

10. *Order Dated September 13, 2010.*

## MEMORANDUM OPINION

Defendants Ashton Hall, Inc. and Stanley Segal appeal the order of this court dated September 13, 2010. That order was entered to amend an incorrectly entered verdict.

Plaintiff Reliant Healthcare Management, Inc. ("Reliant") and defendant Ashton Hall, Inc. ("Ashton Hall") were parties to a management agreement. Under the management agreement, Reliant agreed to manage the Ashton Hall Nursing Home, a business owned by Ashton Hall and individual defendant Stanley Segal.

On January 16, 2008, Ashton Hall and Segal terminated Reliant as manager of the Ashton Hall Nursing Home, and Reliant filed suit against them. At the close of trial, the jury found in favor of Reliant and against Ashton Hall, and compensatory damages were assessed against Ashton Hall in the amount of $829,269. The jury found that individual defendant Segal had tortiously interfered with the management agreement executed between Ashton hall

and Reliant. However, the jury trial worksheet recording the verdict was inadvertently silent as to the compensatory damages awarded against defendant Segal for his tortious interference with the management agreement.[111]

Reliant filed a post-trial motion to conform civil trial worksheet and docket entry to jury verdict. The motion asked the court to rectify the civil trial worksheet as to include compensatory damages in the amount of $829,269 against defendant Segal for his tortious interference with the management agreement. This court granted the motion because the trial worksheet inadvertently omitted assessment of compensatory damages against defendant Segal, even though the jury found that he had tortiously interfered with the management agreement.[112]

For the foregoing reason, this court respectfully suggests that its order dated September 13, 2010 should be affirmed on appeal.

11. *Order Dated October 15, 2010.*

MEMORANDUM OPINION

Defendants Ashton Hall, Inc., and Stanley Segal appeal the order of this court dated October 15, 2010. That order

---

111. Trial worksheet, dated July 29, 2010.

112. "The power to amend its records, to correct mistakes of the clerk or other officer of the court, inadvertencies of counsel, or to supply defects or omissions in the record...is inherent in courts of justice." *Great American Credit Corporation v. Thomas Mini-Markets. Inc.*, 326 A.2d 517, 519 (Pa. Super. 1974).

Pa. R.A.P. 1926 -- Correction or Modification of the Record, states that, "If anything material to either party is omitted from the record by error or accident...the parties by stipulation, or the lower court either before or after the record is transmitted to the appellate court, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected...."

denied defendants' motion to vacate this court's prior orders dated September 11, 2010, and September 13, 2010. The prior orders modified a verdict which had been rendered by the jury at the end of trial. Specifically, the order dated September 11, 2010 assessed attorneys' fees against defendants pursuant to unambiguous terms of a written contract. The order dated September 13, 2010 assessed against defendant Segal compensatory damages which had been inadvertently omitted in the jury trial worksheet.

The motion to vacate the two prior orders argued that this court should not have issued the two orders while defendant Segal underwent bankruptcy proceedings. The motion argued that bankruptcy proceedings stayed the instant action and deprived this court of jurisdiction to issue orders in the case.

> The power to amend its records, to correct mistakes of the clerk or other officer of the court, inadvertencies of counsel, or to supply defects or omissions in the record... is inherent in courts of justice.[113]

In this case the orders dated September 11 and 13, 2010 merely rectified omissions in the jury trial worksheet as to include an award of attorneys' fees negotiated by the parties, and assessment of compensatory damages against a tortious defendant. The order dated October 15, 2010 denied the motion of defendants Ashton Hall and Segal to vacate those orders because the bankruptcy stay did not affect the right of this court to correct a ministerial error

---

113. *Great American Credit Corporation v. Thomas Mini-Markets, Inc.*, 326 A.2d 517, 519 (Pa. Super. 1974).

of record.[114]

For the foregoing reason, this court respectfully suggests that its order dated October 15, 2010 should be affirmed on appeal.

12. *Order Dated November 24, 2010.*

### MEMORANDUM OPINION

On July 27, 2010, the jury returned a verdict against defendants Ashton Hall and Stanley Segal, and in favor of plaintiff, Reliant Healthcare Management, Inc. On August 13, 2010, defendant Stanley Segal filed a suggestion of bankruptcy with this court. On the same day, plaintiff filed a post-trial motion to modify jury verdict to include award of attorney's fees, and a post trial motion to conform civil trial worksheet and docket entry to verdict. The court granted plaintiff's two motions by orders dated September 11 and 13, 2010, supra.

On September 24, 2010, Ashton Hall, Inc. and Stanley Segal filed a motion to vacate the orders dated September 11 and September 13, 2010. The motion argued that the orders entered on September 11 and 13, 2010 were improper because they were entered after the action had been stayed by the filing of a bankruptcy proceeding. On November 24, 2010, this court entered an order denying the motion to vacate only as to Ashton Hall, Inc., the defendant in this action who had not filed for bankruptcy protection.

On February 16, 2011, this court entered an order denying the motion to vacate as to the Stanley Segal after

---

114. *Rexrod Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994).

that defendant emerged from bankruptcy proceedings.

This court respectfully suggests that the order dated November 24, 2010, denying defendants' motion to vacate the orders dated September 11 and 13, 2010, should be affirmed on appeal. The order of November 24, 2010 should be affirmed because the underlying orders dated September 11 and 13, 2010 corrected a ministerial docketing error and had no effect on the final outcome of the instant action.

For all of the foregoing reasons, this court respectfully suggests that all of the above-appealed items should be affirmed.